UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DISABILITY RIGHTS NEW YORK,

                              Plaintiff,

v.

NEW YORK STATE DEP'T OF CORR. AND
CMTY. SUPERVISION; and ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Comm'r of the New York State Dep't of Corr.
and Cmty. Supervision,

                              Defendants.
_____

1:18-CV-0980
(GTS/CFH)

APPEARANCES:                          OF COUNSEL:

DISABILITY RIGHTS NEW YORK            BETSY C. STERLING, ESQ.
  Counsel for Plaintiff               BRANDY L. L. TOMLINSON, ESQ.
44 Exchange Boulevard, Suite 110
Rochester, New York 14614

DISABILITY RIGHTS NEW YORK            CHRISTINA ASBEE, ESQ.
  Counsel for Plaintiff               JENNIFER J. MONTHIE, ESQ.
725 Broadway, Suite 450
Albany, New York 12207

HON. LETITIA A. JAMES                 BRIAN W. MATULA, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this civil rights action filed by Disability Rights New York

("Plaintiff" or "DRNY") against the New York State Department of Corrections and Community

Supervision ("DOCCS") and its Acting Commissioner, Anthony Annucci (collectively,

"Defendants"), are the following three motions: (1) Plaintiff's motion for permission to refer to the inmates referenced in the Complaint by pseudonyms; (2) Defendants' motion for summary judgment; and (3) Plaintiff's cross-motion for summary judgment. (Dkt. Nos. 5, 15, 25.) For the reasons set forth below, Plaintiff's motion to use pseudonyms is granted, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiff's cross-motion for summary judgment is denied.

I.      RELEVANT BACKGROUND

        A.      Summary of Plaintiff's Complaint

        Generally, liberally construed, Plaintiff's Complaint alleges that DRNY is the federally designated Protection and Advocacy ("P&A system") system in the State of New York and it possesses the right to access certain records pursuant to a number of federal statutes. (Dkt. No. 1, at ¶ 1 [Plf.'s Compl.].) These rights are intended to further DRNY's federally funded activities related to the following: (1) investigating incidents of abuse and neglect of individuals with disabilities; (2) pursuing administrative, legal, and other appropriate remedies on behalf of those individuals; and (3) providing information and referrals related to programs and services addressing the needs of persons with disabilities. (*Id*. at ¶ 13.) Relying on this statutory authority, DRNY has made numerous requests for records from DOCCS, and has provided DOCCS a reasonable time frame in which to respond. (*Id*. at ¶¶ 251-52.) However, DOCCS has unlawfully denied or delayed DRNY's access to the records of 32 inmates held in DOCCS' custody, and one deceased inmate who died while in DOCCS' custody, in violation of one or more of the P&A statutes. (*Id*.)

        Based on these factual allegations, Plaintiff asserts four claims: (1) a claim for relief

pursuant to the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. § 15041 *et seq*.; (2) a claim for relief pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq*.; (3) a claim for relief pursuant to the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e (collectively the "P&A statutes"); and (4) a claim for relief pursuant to the Protection and Advocacy for Assistive Technology Act of 2004 ("PAAT Act"), 29 U.S.C.A. § 3001 *et seq*.[1]  (*Id*. at ¶¶ 253-76.)

As relief, Plaintiff's Complaint requests the following: (1) a declaratory judgment that Defendants have violated Plaintiff's rights under the DD Act, the PAIMI Act, the PAIR Act, the PAAT Act, and 42 U.S.C. § 1983; (2) a declaratory judgment that Defendants have an obligation to ensure that the access rights granted to Plaintiff by the P&A statutes are fully and uniformly implemented; (3) a permanent injunction ordering Defendants to provide timely and complete responses to all outstanding and future record requests made by Plaintiff pursuant to its federally mandated P&A authority; and (4) an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.  (*Id*. at 24.)

Further familiarity with the Complaint's factual allegations, legal claims and requests for relief is assumed in this Decision and Order, which is intended primarily for review by the parties.  The Court would conclude its summary by adding merely that Plaintiff's Complaint

---

[1]     Although Plaintiff has asserted a claim under the PAAT Act, the Court is uncertain whether the PAAT Act, which encourages states to develop systems for improving access to assistive technology devices and related services for individuals with disabilities, provides a basis for relief that is available to Plaintiff under the circumstances.  In addition, as will be discussed later in this Decision and Order, Plaintiff did not indicate in any of its record requests that those requests were being made pursuant to authority under the PAAT Act.

alleges violations of the P&A statutes related to the records of *only* Inmates A through HH. (Dkt. No. 1 [Plf.'s Compl.].) However, in support of its cross-motion, Plaintiff has alleged additional facts involving record requests related to a number of other inmates, identified as Inmates II through SS. (Dkt. No. 25, Attach. 2 [Plf.'s Rule 7.1 Statement].) Because Plaintiff has not requested or been granted leave to amend its Complaint to include these additional facts,[2] they will not be considered in deciding the current cross-motions for summary judgment.

**B.    Undisputed Material Facts on the Parties' Motions for Summary Judgment**

**1.    Undisputed Material Facts on Defendants' Motion for Summary Judgment**

The following facts have been asserted and supported with accurate record citations by Defendants in their Statement of Material Facts, and expressly admitted or not denied with a supporting record citation by Plaintiff in its response thereto. (*Compare* Dkt. No. 15, Attach. 2 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 25. Attach. 3 [Plf.'s Rule 7.1 Resp.].)

1.    Defendant Annucci has been sued solely in his official capacity.

2.    Generally, Plaintiff did not allege in any of its requests to DOCCS at issue in this case that the inmates, whose records were the subject of the requests, were individuals who had a "developmental disability" or "a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State." The only time that Plaintiff referenced any specific disability was in regard to its requests for records related to Inmate E and Inmate V.

---

[2]    The Court notes that Plaintiff attempted to amend its Complaint on December 6, 2018. (Dkt. No. 21), and the Court (liberally construing that attempt as a motion to amend) denied that motion to amend without prejudice on December 7, 2018. (Dkt. No. 22 [Text Order filed December 7, 2018].) In any event, the proposed Amended Complaint did not mention Inmates II through SS. (Dkt. No. 21, Attach. 1 [Proposed Am. Compl.].)

3.      With the exception of certain of Inmate A's records, Plaintiff has never been denied physical access to physical files maintained by DOCCS in any of its facilities, with regard to the requests identified in the Complaint.

4.      Plaintiff was provided with the records it requested pertaining to Inmate T on or about July 26, 2018.

5.      Plaintiff was provided with the records it requested pertaining to Inmate U on or about July 26, 2018.

6.      With respect to all record requests identified in the Complaint, Plaintiff requested that DOCCS provide an estimate of copying costs prior to the production of responsive records.

7.      When DOCCS provided the cost estimate requested by Plaintiff for records related to Inmates B through Z, and BB through HH, DOCCS also offered Plaintiff physical access to the records as an alternative to waiting for DOCCS to provide copies.

8.      Plaintiff has never paid for the records requested for Inmate E.

9.      Plaintiff's payment for records of Inmate FF was deposited by DOCCS five days before Plaintiff filed its Complaint.

10.     Plaintiff's payment for records of Inmate GG was deposited by DOCCS one day after Plaintiff filed its Complaint.

11.     Before filing its Complaint, Plaintiff was provided with the records of Inmates B, C, E, F, K, L, M, N, T, U, and W, as well as records pertaining to Residential Treatment Facilities ("RTFs") operated by DOCCS.

12.     After filing its Complaint, Plaintiff was provided with records related to Inmates D, G, H, I, J, O, P, Q, R, S, X, Z, AA, BB, DD, EE, FF, GG and HH.

13.	Plaintiff never identified any specific inmate in connection with its request for records pertaining to RTFs operated by DOCCS.

14.	Plaintiff never requested that it be provided with access to the physical files of Inmate A.

## 2.	Undisputed Material Facts on Plaintiff's Cross-Motion for Summary Judgment

The following facts have been asserted and supported with accurate record citations by Plaintiff in its Statement of Material Facts, and expressly admitted or not denied with a supporting record citation by Defendants in their response thereto. (*Compare* Dkt. No. 25, Attach. 2 [Plfs.' Rule 7.1 Statement] *and* Dkt. No. 32, Attach. 2 [Plf.'s Supp. Rule 7.1 Statement] *with* Dkt. No. 31, Attach. 1 [Defs.' Rule 7.1 Resp.] *and* Dkt. No. 40 [Defs.' Rule 7.1 Resp. to Plf.'s Supp. Rule 7.1 Statement].)

### a.	Plaintiff

1.	The State of New York has established a P&A System.

2.	Disability Advocates, Inc., is an independent non-profit corporation organized under the laws of the State of New York. It does business and has sued under the name Disability Rights New York.

3.	At all times relevant to this action, DRNY has been and is the statewide P&A system designated by the Governor of the State of New York to protect and advocate for the legal and civil rights of people with disabilities in the State of New York.

### b.	Defendants

4.	Defendant Annucci is the Acting Commissioner of DOCCS.

5.     Defendant DOCCS is an agency within the New York State Executive Department.

6.     Defendant DOCCS is a state agency whose responsibilities include the operation of correctional facilities, including housing for inmates with disabilities.

**c.     DRNY's Requests for Records from DOCCS**

7.     From January 1, 2018, to the present, DRNY has made requests for access to records pursuant to the P&A statutes for individuals with disabilities who it believes are in the custody of DOCCS.

8.     DOCCS' counsel, Cathy Y. Sheehan, instructed DRNY to submit all document requests by email to a specific email address.

9.     Sheehan later instructed DRNY to submit all document requests to a different email address.

10.     With regard to its requests for records related to Inmates B through HH, DRNY provided DOCCS more time than prescribed in the P&A statutes to provide copies.

11.     DRNY regularly extended the timeline for releasing records from three business days (as required by the regulation implementing the DD Act), and requested that DOCCS provide a cost estimate within seven business days of a request, and copies within two business days of receipt of payment for requests pursuant to the DD Act.

12.     DRNY also regularly provided Defendants with seven business days to provide the cost estimate for records, and two business days to produce responsive records upon receipt of payment pursuant to the PAIMI Act.

13.     From January 1, 2018, to the present, DRNY has paid DOCCS at least $2,373.75

in copying costs for its record requests.[3]

### d.    Inmate A Records

14.    On March 17, 2016, DRNY requested records from DOCCS to investigate the death of Inmate A.

15.    At the time of DRNY's initial records request regarding Inmate A, DOCCS did not have the requested autopsy report.

16.    On January 3, 2018, DRNY made a second request for Inmate A's autopsy report.

17.    On January 22, 2018, DOCCS denied DRNY's request.

18.    On January 26, 2018, DRNY made a third written request, pursuant to the P&A statutes, for the records of Inmate A and for documents including the autopsy report and death certificate.

19.    By letter dated March 13, 2018, DOCCS again refused DRNY access to the death certificate and autopsy report of Inmate A.

20.    In its letter of March 13, 2018, DOCCS explained that it "may not disclose an inmate's autopsy report and death certificate absent a valid HIPAA authorization from the inmate's estate."

21.    At no point in time between March 17, 2016, and August 15, 2018, did DRNY inform DOCCS that DRNY had closed the investigation of the death of Inmate A.

22.    DOCCS has not provided DRNY with the requested autopsy report for Inmate A.

### e.    RTF Investigation

---

[3]    This number is based upon DOCCS' standard copying fee of $0.25 per page, and the approximately 9,495 pages of records that have been provided by DOCCS.

23.     On March 26, 2018, DRNY requested records related to DOCCS' operation of RTFs.

24.     In its records request of March 26, 2018, DRNY requested the cost of copies for the requested records within seven business days or a statement for the reason for delay or denial.

25.     On April 5, 2018, DOCCS informed DRNY that DOCCS was consolidating DRNY's records request of March 26, 2018, with an earlier New York State Freedom of Information Law ("FOIL") request from DRNY.

26.     On May 11, 2018, DOCCS provided some records related to the RTF that DOCCS described as responsive to the FOIL request; but DOCCS did not reference the P&A statutes in the accompanying correspondence.

### f.     Inmate B Records

27.     On February 5, 2018, Inmate B signed authorizations permitting DRNY to access his records.

28.     On February 15, 2018, DRNY submitted a request by email to DOCCS for records related to Inmate B.

29.     DRNY made its request of February 15, 2018, for records related to Inmate B pursuant to the DD Act and PAIMA Act.

30.     On March 9, 2018, DRNY emailed DOCCS a copy of Inmate B's signed HIPAA release.

31.     By letter dated March 19, 2018, DOCCS provided DRNY with a cost estimate for

copying the requested records related to Inmate B.[4]

32.     On April 2, 2018, DRNY issued a payment for the records requested by DRNY on February 15, 2018, related to Inmate B.

33.     On May 8, 2018, DRNY received the records responsive to its request of February 15, 2018, related to Inmate B.

34.     On May 18, 2018, DRNY requested additional records from DOCCS by email related to Inmate B.

35.     By letter dated June 11, 2018, DOCCS provided a cost estimate for the requested additional records related to Inmate B.[5]

36.     On June 28, 2018, DRNY issued a payment for the records it requested on May 18, 2018, related to Inmate B.

37.     On July 10, 2018, DRNY received DOCCS's letter of July 6, 2018, and the enclosed records.

**g.     Inmate C Records**

38.     On February 7 and 27, 2018, Inmate C signed authorizations permitting DRNY to access his records.

39.     On March 9, 2018, DRNY requested records from DOCCS related to Inmate C pursuant to its P&A authority.

40.     DOCCS did not provide DRNY with a written statement of the reasons for the

---

[4]     DOCCS indicated that 181 pages of records were available to be copied at a cost of $45.25.

[5]     DOCCS indicated that 31 pages of records were available to be copied at a cost of $7.75.

delay in providing Inmate C's records within one business day after the expiration of the deadline set forth in DRNY's request.

41.     By letter dated March 15, 2018, DOCCS provided DRNY with a cost estimate for the requested records related to Inmate C.[6]

42.     On April 2, 2018, DRNY issued a payment for the records related to Inmate C.

43.     On April 12, 2018, DRNY received the records requested related to Inmate C.

**h.     Inmate D Records**

44.     On November 2, 2017, Inmate D signed authorizations permitting DRNY to access his records.

45.     On March 13, 2018, DRNY requested records from DOCCS related to Inmate D pursuant to its P&A authority.

46.     DRNY did not receive DOCCS' original letter with the cost estimate for Inmate D's records dated March 21, 2018.

47.     DRNY sent a follow-up request related to Inmate C's records, dated July 18, 2018, that included a copy of the cost estimate of March 21, 2018.[7]

48.     On August 3, 2018, DRNY issued a payment for the records requested by DRNY on March 13, 2018, related to Inmate D.

49.     On September 18, 2018, DRNY received the records related to Inmate D in a letter dated August 24, 2018.

---

[6]     DOCCS indicated that 157 pages of records were available to be copied at a cost of $39.25.

[7]     DOCCS indicated that 14 pages of records were available at a copying cost of $2.25.

### i.  Inmate E Records

50.     On March 3, 2018, Inmate E signed authorizations permitting DRNY to access his records.

51.     On March 14, 2018, DRNY requested records from DOCCS related to Inmate E pursuant to its P&A authority.

52.     On March 30, 2018, DRNY received a letter with the cost estimate for requested records related to Inmate E.[8]

53.     DRNY issued payment for the records on April 12, 2018.

54.     DRNY received the records requested on April 30, 2018.

55.     On June 11, 2018, DRNY made a second records request related to Inmate E pursuant to its P&A authority.

56.     On July 5, 2018, DRNY received DOCCS' letter dated June 21, 2018, with the cost estimate for the records request related to Inmate E.

57.     To date, DOCCS has not provided confirmation that documents among the 242 pages identified in that cost estimate are responsive to DRNY's June 11, 2018, records request related to Inmate E.  On July 16, 2018, DOCCS advised DRNY in writing as follows:

> The Department will not sort through hundreds of pages of records in an attempt to identify individual records which may be responsive to your request.  The records you sought, if they exist, would be located in the inmate's medical record.  Accordingly, we have provided a page count for the portion of the medical record which would contain the documents you are seeking.

---

[8]     DOCCS indicated that 99 pages of records were available at a copying cost of $24.75.

### j.     Inmate F Records[9]

58.     On March 28, 2018, Inmate F signed authorizations permitting DRNY to access his records.

59.     On May 18, 2018, DRNY requested records from DOCCS related to Inmate F pursuant to its P&A authority.

60.     On June 21, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records of Inmate F.[10]

61.     On July 12, 2018, DRNY issued payment for records of Inmate F.

62.     On July 25, 2018, DRNY received records partially responsive to its records request of May 18, 2018, related to Inmate F.

63.     On August 28, 2018, DOCCS emailed DRNY additional documents responsive to DRNY's records request of May 18, 2018, related to Inmate F.

### k.     Inmate G Records

64.     On February 20, 2018, Inmate G signed authorizations permitting DRNY to access his records.

65.     On April 18, 2018, DRNY requested records from DOCCS related to Inmate G, pursuant to its P&A authority.[11]

---

[9]     The Court notes that the materiality of these post-May 14 facts is minimal with respect to Plaintiff's claims regarding Inmate F's records as set forth in the Complaint. This is because the Complaint is limited to an earlier records request regarding Inmate F that was made on April 17, 2018, and completed on May 14, 2018. (Dkt. No. 1, at ¶¶ 97-101 [Plf.'s Compl.].)

[10]     DOCCS indicated 19 pages of records were responsive to Plaintiff's request at a copying cost of $4.75.

[11]     DRNY included Inmate G as part of a combined request that also included records of Inmates H, I, and J.

66.     On May 10, 2018, DRNY received a letter from DOCCS that stated that a page count for copies "will be provided under a separate cover."

67.     On June 21, 2018, DRNY received DOCCS' letter of June 18, 2018, with the cost estimate for a partial set of records responsive to DRNY's request related to Inmate G.[12]

68.     In its letter of June 18, 2018, DOCCS identified files that may be exempt from disclosure or redacted.

69.     On July 12, 2018, DRNY issued payment for Inmate G's partial set of records.

70.     On August 29, 2018, DRNY received a partial set of records responsive to DRNY's April 18, 2018, request related to Inmate G.[13]

71.     In its letter of August 27, 2018, DOCCS explained that it was continuing to process specific records responsive to DRNY's request of April 18, 2018, related to Inmate G.

72.     On November 2, 2018, DRNY received DOCCS's letter dated October 23, 2018, with additional responsive records related to Inmate G.

**l.     Inmate H Records**

73.     On April 18, 2018, DRNY requested records from DOCCS related to Inmate H, pursuant to its P&A authority.[14]

74.     On May 10, 2018, DRNY received a letter from DOCCS that stated that a page count for copies "will be provided under a separate cover."

---

[12]     DOCCS indicated that 1,777 pages were responsive to DRNY's combined request for records for Inmate G and other inmates at a copying cost of $444.25.

[13]     DOCCS provided a total of 830 pages of records that included records related to Inmate G.

[14]     DRNY included Inmate H as part of a combined request that also included records of Inmates G, I, and J.

75.     On June 21, 2018, DRNY received DOCCS's letter, with the cost estimate for records partially responsive to DRNY's request related to Inmate H.

76.     DOCCS notified DRNY that there may be files exempt from disclosure or requiring redaction.

77.     On July 12, 2018, DRNY issued payment for the partial set of records responsive to DRNY's request related to Inmate H.

78.     By letter dated August 27, 2018, DOCCS acknowledged receipt of payment for records of Inmate H.

79.     On August 29, 2018, DRNY received DOCCS' letter dated August 27, 2018, with records of Inmate H enclosed therein.

80.     In its letter of August 27, 2018, DOCCS explained that it was continuing to process specific records responsive to DRNY's April 18, 2018, request related to Inmate H.

81.     On November 2, 2018, DRNY received DOCCS's letter dated October 23, 2018, with additional responsive records related to Inmate H.

82.     In its letter of October 23, 2018, DOCCS explained that it was continuing to process Inmate H's parole file.

83.     On December 11, 2018, DRNY received additional records of Inmate H.

84.     DOCCS explained in the accompanying correspondence that this set of records "is the final production for this request."

### m.     Inmate I Records

85.     On March 19, 2018, Inmate I signed authorizations permitting DRNY to access his records.

86.     On April 18, 2018, DRNY requested records from DOCCS related to Inmate I, pursuant to its P&A authority.[15]

87.     On May 10, 2018, DRNY received a letter from DOCCS that stated that a page count for copies "will be provided under a separate cover."

88.     On June 21, 2018, DRNY received a letter from DOCCS with the cost estimate for records partially responsive to DRNY's April 18, 2018, request related to Inmate I.

89.     In its letter of June 18, 2018, DOCCS identified files that may be exempt from disclosure or redacted.

90.     On July 12, 2018, DRNY issued a payment for the partial set of records responsive to DRNY's April 18, 2018, request related to Inmate I.

91.     By letter dated August 27, 2018, DOCCS acknowledged receipt of payment related to the records of Inmate I.

92.     On August 29, 2018, DRNY received DOCCS's letter dated August 27, 2018, with records of Inmate I enclosed therein.

### n.     Inmate J Records

93.     On March 2, 2018, Inmate J signed authorizations permitting DRNY to access his records.

94.     On April 18, 2018, DRNY requested records related to Inmate J by email pursuant to its P&A authority.[16]

---

[15]     DRNY included Inmate I as part of a combined request that also included records of Inmates G, H, and J.

[16]     DRNY included Inmate J as part of a combined request that also included records of Inmates G, H, and I.

95.     On May 10, 2018, DRNY received a letter from DOCCS that stated that a page count for copies "will be provided under a separate cover."

96.     On June 21, 2018, DRNY received a letter from DOCCS with the cost estimate for records partially responsive to DRNY's request related to Inmate J.

97.     DOCCS identified files that may be exempt from disclosure or redacted.

98.     On July 12, 2018, DRNY issued payment for the partial set of records related to Inmate J.

99.     By letter dated August 27, 2018, DOCCS acknowledged receipt of payment for Inmate J's records.

100.    On August 29, 2018, DRNY received DOCCS' letter dated August 27, 2018, with records related to Inmate J.

101.    In its letter of August 27, 2018, DOCCS explained that it was continuing to process specific records responsive to DRNY's April 18, 2018, request related to Inmate J.

102.    On November 2, 2018, DRNY received DOCCS' letter dated October 23, 2018, with additional responsive records related to Inmate J.

### o.      Inmate K Records

103.    On December 5, 2017, Inmate K signed authorizations permitting DRNY to access his records.

104.    On April 20, 2018, DRNY requested records related to Inmate K, pursuant to its P&A authority.

105.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate K's records within one business day after the expiration of the deadline

set forth in DRNY's request.

106.    On May 9, 2018, DRNY received a letter from DOCCS with a cost estimate for requested records related to Inmate K.[17]

107.    On July 12, 2018, DRNY issued payment for the records requested related to Inmate K.

108.    On July 24, 2018, DRNY received the records related to Inmate K.

### p.    Inmate L Records

109.    On December 5, 2017, Inmate L signed authorizations permitting DRNY to access his records.

110.    On April 20, 2018, DRNY requested records from DOCCS related to Inmate L, pursuant to its P&A authority.

111.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate L's records within one business day after the expiration of the deadline set forth in DRNY's request.

112.    On June 14, 2018, DRNY received DOCCS' letter with the cost estimate for requested records related to Inmate L.[18]

113.    On June 28, 2018, DRNY issued payment for the records requested by DRNY related to Inmate L.

114.    On July 17, 2018, DRNY received records responsive to DRNY's records request

---

[17]    DOCCS indicated that 31 pages of records were available at a copying cost of $7.75.

[18]    DOCCS indicated that 19 pages of records were available at a copying cost of $4.75.

related to Inmate L.

### q.      Inmate M Records

115.      On December 5, 2017, Inmate M signed authorizations permitting DRNY to access his records.

116.      On April 20, 2018, DRNY requested records related to Inmate M, pursuant to its P&A authority.

117.      DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate M's records within one business day after the expiration of the deadline set forth in DRNY's request.

118.      On May 21, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records related to Inmate M.[19]

119.      On June 4, 2018, DRNY issued payment for the records related to Inmate M.

120.      On June 14, 2018, DRNY received records related to Inmate M.

### r.      Inmate N Records

121.      On December 5, 2017, Inmate N signed authorizations permitting DRNY to access his records.

122.      On April 20, 2018, DRNY requested records related to Inmate N, pursuant to its P&A authority.

123.      On May 2, 2018, DRNY received a letter from DOCCS with the cost estimate for

---

[19]      DOCCS indicated that 31 pages of records were available at a copying cost of $7.75.

requested records of Inmate N.[20]

124.    DOCCS did not provide DRNY with a written statement of the reasons for the delay of Inmate N's records within one business day after the expiration of the deadline set forth in DRNY's request.

125.    On May 14, 2018, DRNY issued payment for the records related to Inmate N.

126.    On May 24, 2018, DRNY received records related to Inmate N.

**s.    Inmate O Records**

127.    On December 5, 2017, Inmate O signed authorizations permitting DRNY to access his records.

128.    On April 24, 2018, DRNY requested records from DOCCS related to Inmate O, pursuant to its P&A authority.

129.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate O's records within one business day after the expiration of the deadline set forth in DRNY's request.

130.    On May 9, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records related to Inmate O.[21]

131.    On May 21, 2018, DRNY issued payment for the records related to Inmate O.

132.    On October 3, 2018, DRNY received records related to Inmate O.

**t.    Inmate P Records**

133.    On December 5, 2017, Inmate P signed authorizations permitting DRNY to access

---

[20]    DOCCS indicated that 377 pages of records were available at a copying cost of $94.25.

[21]    DOCCS indicated that 137 pages of records were available at a cost of $34.25.

his records.

134.     On April 24, 2018, DRNY requested records from DOCCS related to Inmate P, pursuant to its P&A authority.

135.     DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate P's records within one business day after the expiration of the deadline set forth in DRNY's request.

136.     On May 7, 2018, DRNY received a letter from DOCCS with the cost estimate for requested records of Inmate P.

137.     On May 21, 2018, DRNY issued payment for the records related to Inmate P.

138.     On October 9, 2018, DRNY received records related to Inmate P.

**u.     Inmate Q Records**

139.     On December 5, 2017, Inmate Q signed authorizations permitting DRNY to access his records.

140.     On April 24, 2018, DRNY requested records from DOCCS related to Inmate Q, pursuant to its P&A authority.

141.     DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate Q's records within one business day after the expiration of the deadline set forth in DRNY's request.

142.     On May 21, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records of Inmate Q.

143.     On June 4, 2018, DRNY issued payment for the records related to Inmate Q.

144.     On September 20, 2018, DRNY received records related to Inmate Q.

**v.     Inmate R Records**

145. On April 23, 2018, Inmate R signed an authorization permitting DRNY to access his records.

146. On May 2, 2018, DRNY requested records from DOCCS related to Inmate R, pursuant to its P&A authority.

147. DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate R's records within one business day after the expiration of the deadline set forth in DRNY's request.

148. By letter dated May 24, 2018, DOCCS provided DRNY a cost estimate for the requested records related to Inmate R.[22]

149. On May 29, 2018, DRNY received the letter with the cost estimate for requested records related to Inmate R.

150. On June 11, 2018, DRNY issued payment to DOCCS for the records of Inmate R.

151. On June 22, 2018, DRNY received records related to Inmate R.

152. On June 25, 2018, DRNY received additional records related to Inmate R.

### w. Inmate S Records

153. On April 29, 2018, Inmate S signed an authorization permitting DRNY to access his records.

154. On May 22, 2018, DRNY requested records from DOCCS related to Inmate S, pursuant to its P&A authority.

155. DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate S's records within one business day after the expiration of the deadline

---

[22] DOCCS indicated that 354 pages of records were available at a copying cost of $88.50.

set forth in DRNY's request.

156.    On June 20, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records related to Inmate S.

157.    On July 12, 2018, DRNY issued payment for the records requested related to Inmate S.

158.    On October 4, 2018, DRNY received records related to Inmate S.

### x.    Inmate T Records

159.    On April 25, 2018, Inmate T signed an authorization permitting DRNY to access his records.

160.    On May 23, 2018, DRNY requested records related to Inmate T, pursuant to its P&A authority.

161.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate T's records within one business day after the expiration of the deadline set forth in DRNY's request.

162.    On June 18, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate T.

163.    On June 28, 2018, DRNY issued payment for the records related to Inmate T.

164.    On August 2, 2018, DRNY received records related to Inmate T.

### y.    Inmate U Records

165.    On May 30, 2018, Inmate U signed an authorization permitting DRNY to access his records.

166.    On June 11, 2018, DRNY requested records from DOCCS related to Inmate U,

pursuant to its P&A authority.

167.    On July 6, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate U.[23]

168.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate U's records within one business day after the expiration of the deadline set forth in DRNY's request.

169.    On July 12, 2018, DRNY issued payment for the records related to Inmate U.

170.    On July 24, 2018, DRNY received records related to Inmate U.

z.    **Inmate V Records**

171.    On March 22, 2018, Inmate V signed authorizations permitting DRNY to access his records.

172.    On June 11, 2018, DRNY requested records related to Inmate V, pursuant to its P&A authority.

173.    On July 18, 2018, DRNY received a letter from DOCCS with the cost estimate for requested records related to Inmate V.[24]

174.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate V's records within one business day after the expiration of the deadline set forth in DRNY's request.

175.    On September 13, 2018, DRNY received another letter from DOCCS with an

---

[23]    DOCCS indicated that 331 pages of records were available at a copying cost of $98.85.

[24]    DOCCS indicated that 354 pages of records were available at a copying cost of $88.50.

updated cost estimate for requested records related to Inmate V, that stated that Inmate V had been transferred to a different facility, which now held his records.

176.     On September 21, 2018, DRNY issued payment for the records related to Inmate V.

177.     On October 12, 2018, DRNY received records related to Inmate V.

### aa.     Inmate W Records

178.     On December 5, 2017, Inmate W signed authorizations permitting DRNY to access his records.

179.     On June 14, 2018, DRNY requested records related to Inmate W, pursuant to its P&A authority.

180.     DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate W's records within one business day after the expiration of the deadline set forth in DRNY's request.

181.     On July 9, 2018, DRNY received a letter from DOCCS with the cost estimate for requested records related to Inmate W.[25]

182.     On July 12, 2018, DRNY issued payment for the records requested related to Inmate W.

183.     On July 26, 2018, DRNY received records related to Inmate W.

### bb.     Inmate X Records

184.     On December 5, 2017, Inmate X signed authorizations permitting DRNY to access his records.

---

[25]     DOCCS indicated that 11 pages of records were available at a copying cost of $2.75.

185.    On June 14, 2018, DRNY requested records related to Inmate X, pursuant to its P&A authority.

186.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate X's records within one business day after the expiration of the deadline set forth in DRNY's request.

187.    On July 5, 2018, DRNY received a letter from DOCCS with the cost estimate for requested records related to Inmate X.[26]

188.    On July 12, 2018, DRNY issued payment for the records related to Inmate X.

189.    On October 3, 2018, DRNY received records related to Inmate X.

### cc.    Inmate Y Records

190.    On December 5, 2017, Inmate Y signed authorizations permitting DRNY to access his records.

191.    On June 18, 2018, DRNY requested records from DOCCS related to Inmate Y, pursuant to its P&A authority.

192.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate Y's records within one business day after the expiration of the deadline set forth in DRNY's request.

193.    On August 3, 2018, DRNY received a letter from DOCCS with the cost estimate for the requested records related to Inmate Y.[27]

---

[26]    DOCCS indicated that 83 pages of records were available at a copying cost of $20.75.

[27]    DOCCS indicated that 7 pages of records were available at a copying cost of $1.75.

194.    As of the filing date of Plaintiff's cross-motion, DRNY had not received records related to Inmate Y.

### dd.    Inmate Z Records

195.    On June 18, 2018, DRNY requested records related to Inmate Z, pursuant to its P&A authority.

196.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate Z's records within one business day after the expiration of the deadline set forth in DRNY's request.

197.    On September 12, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate Z.[28]

198.    On September 21, DRNY issued payment for the records requested related to Inmate Z.

199.    On October 1, 2018, DRNY received records related to Inmate Z.

### ee.    Inmate AA Records

200.    On December 5, 2017, Inmate AA signed authorizations permitting DRNY to access his records.

201.    On June 20, 2018, DRNY requested records from DOCCS related to Inmate AA, pursuant to its P&A authority.

202.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate AA's records within one business day after the expiration of the deadline set forth in DRNY's request.

---

[28]    DOCCS indicated that 156 pages of records were available at a copying cost of $39.00.

203.     On September 12, 2018, DRNY received records related to Inmate AA.

### ff.     Inmate BB Records

204.     On December 5, 2017, Inmate BB signed authorizations permitting DRNY to access his records.

205.     On June 20, 2018, DRNY requested records from DOCCS related to Inmate BB, pursuant to its P&A authority.

206.     On July 12, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate BB.

207.     DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate BB's records within one business day after the expiration of the deadline set forth in DRNY's request.

208.     On July 18, 2018, DRNY issued payment for the records related to Inmate BB.

### gg.     Inmate CC Records

209.     On December 5, 2017, Inmate CC signed authorizations permitting DRNY to access his records.

210.     On June 20, 2018, DRNY requested records from DOCCS related to Inmate CC, pursuant to its P&A authority.

211.     On July 20, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate CC.[29]

212.      On July 24, 2018, DRNY issued payment for the records related to Inmate CC.

213.     DOCCS did not provide DRNY with a written statement of the reasons for the

---

[29]     DOCCS indicated that 15 pages of records were available at a copying cost of $3.75.

delay in providing Inmate CC's records within one business day after the expiration of the deadline set forth in DRNY's request.

214.    On October 3, 2018, DRNY received records related to Inmate CC.

**hh.    Inmate DD Records**

215.    On December 5, 2017, Inmate DD signed authorizations permitting DRNY to access his records.

216.    On June 22, 2018, DRNY requested records from DOCCS related to Inmate DD, pursuant to its P&A authority.

217.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate DD's records within one business day after the expiration of the deadline set forth in DRNY's request.

218.    On September 13, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate DD.

219.    On September 21, 2018, DRNY issued payment for the records related to Inmate DD.

220.    On October 15, 2018, DRNY received records related to Inmate DD.

**ii.    Inmate EE Records**

221.    On December 5, 2017, Inmate EE signed authorizations permitting DRNY to access his records.

222.    On June 22, 2018, DRNY requested records from DOCCS related to Inmate EE, pursuant to its P&A authority.

223.    On July 20, 2018, DRNY received DOCCS's letter with the cost estimate for the

requested records responsive to DRNY's request of June 22, 2018, related to Inmate EE.

224.    On July 27, 2018, DOCCS received DRNY's payment for the records requested by DRNY on June 22, 2018, related to Inmate EE.

225.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate EE's records within one business day after the expiration of the deadline set forth in DRNY's request.

226.    On October 9, 2018, DRNY received records responsive to DRNY's request of June 22, 2018, related to Inmate EE.

### jj.    Inmate FF Records

227.    On December 5, 2017, Inmate DD signed authorizations permitting DRNY to access his records.

228.    On June 22, 2018, DRNY requested records related to Inmate FF, pursuant to its P&A authority.

229.    On July 24, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate FF.[30]

230.    On August 3, 2018, DRNY issued payment for the records related to Inmate FF.

231.    On August 10, 2018, DOCCS confirmed receipt of payment related to Inmate FF.

232.    DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate FF's records within one business day after the expiration of the deadline set forth in DRNY's request.

233.    On September 18, 2018, DRNY received records related to Inmate FF.

---

[30]    DOCCS indicated that 57 pages of records were available at a copying cost of $14.25.

### kk.     Inmate GG Records

234.    On June 3, 2018, Inmate GG signed an authorization permitting DRNY to access his records.

235.    On June 25, 2018, DRNY requested records from DOCCS related to Inmate GG, pursuant to its P&A authority.

236.    On July 25, 2018, DRNY received a letter from DOCCS with the cost estimate for records related to Inmate GG.

237.     DOCCS did not provide DRNY with a written statement of the reasons for the delay in providing Inmate GG's records within one business day after the expiration of the deadline set forth in DRNY's request.

238.    On August 3, 2018, DRNY issued payment for the records related to Inmate GG.

239.    On August 16, 2018, DOCCS confirmed receipt of payment for the records related to Inmate GG.

240.    On August 29, 2018, DRNY received records related to Inmate GG.

### ll.     Inmate HH Records

241.    On June 13, 2018, Inmate HH signed authorizations permitting DRNY to access his records.

242.    On July 6, 2018, DRNY requested records from DOCCS related to Inmate HH, pursuant to its P&A authority.

243.    DOCCS did not provide DRNY with a prompt written statement of the reasons for the delay in providing Inmate HH's records.

244.    On September 12, 2018, DRNY received a letter from DOCCS with the cost

estimate for records related to Inmate HH.[31]

246.    On September 21, 2018, DRNY issued a payment for the records requested by
DRNY on July 6, 2018, related to Inmate HH.

247.    On October 5, 2018, DRNY received records related to Inmate HH.

### 3.    Plaintiff's Supplemental Statement of Undisputed Facts[32]

1.    Since January 16, 2019, DOCCS has created a new policy for responding to
DRNY's request for copies of records.

2.    Pursuant to the new policy, to obtain copies of records, DOCCS requires DRNY
staff to travel to a facility where DOCCS is housing the inmate, physically mark each page
responsive to DRNY's request, and provide a check to DOCCS for the total page count for the
requested copies.

### C.    Parties' Briefing on Their Cross-Motions for Summary Judgment

### 1.    Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment, Defendants assert eight
arguments.  (Dkt. No. 15, Attach. 1 [Defs.' Mem. of Law].)  First, Defendants argue that
Plaintiff's Third and Fourth Claims under the PAIR Act and PAAT Act should be dismissed
because Plaintiff has never requested records pursuant to either of these acts, noting in particular

---

[31]    DOCCS indicated that 144 pages of records were available at a copying cost of
$36.00.

[32]    In its Text Order of April 23, 2019, the Court found that Plaintiff's "supplemental
facts have little (if any) materiality to the claims and requests for relief pending in this action,"
which is based on events occurring on or before August 15, 2018.  (Dkt. No. 1, at 24 [Plf.'s
Compl., dated Aug. 15, 2018]).  *See also* Fed. R. Civ. P. 15(d) (setting forth the procedure by
which a plaintiff may "set[] out any transaction, occurrence, or event that *happened after the date*
of the pleading to be supplemented.") (emphasis added).

that the record requests submitted to DOCCS do not indicate that Plaintiff was making any of those requests pursuant to either of those acts. (*Id.* at 4-5.)

Second, Defendants argue that Plaintiff's First and Second Claims under the DD Act and PAIMI Act should be dismissed for the following reasons: (1) Plaintiff has failed to establish that it neither asserted nor proved in its requests the fact that the inmates to which those requests were related had a developmental disability or mental illness as required by law; (2) Plaintiff has failed to establish that the inmates (to which the requests were related) were identified as "clients" of Plaintiff as required by law; and (3) Plaintiff has failed to establish that DOCCS denied it access to any of the requested records because (i) DOCCS immediately and continuously gave Plaintiff the opportunity to physically inspect and personally photocopy the records at the prison facilities for all requests, (ii) as to Inmate A, Plaintiff's 2018 request for the autopsy report was not noted to be in furtherance of an investigation of Inmate A's death and thus not required to be disclosed at that time under the statutes, and (iii) DOCCS provided Plaintiff with photocopies of the requested records in most cases, and any delay in the provision of those records was generally related to either Plaintiff's failure to pay for the records or its practice of requesting invoices and page counts. (*Id.* at 5-20.)

Third, Defendants argue that Plaintiff's claims related to records from residential treatment facilities ("RTF") should be dismissed because (a) Plaintiff has not alleged or shown that the inmates in question authorized Plaintiff to request those records, (b) Plaintiff's request does not establish that it is based on any complaint alleging abuse or neglect as required by the PAIMI Act, but rather that it was related to complaints about "housing" and "status," and (c) Plaintiff is not entitled under the Act to receive answers to interrogatories as Plaintiff has sought here. (*Id.* at 20-23.)

Fourth, Defendants argue that Plaintiff's claims against Defendant Annucci in his official capacity should be dismissed as duplicative because the claims are asserted against him solely on the basis of his position as Acting Commissioner of DOCCS, and Plaintiff has not otherwise alleged or established that Annucci was personally involved in any of the alleged violations. (*Id.* at 23-24.)

Fifth, Defendants argue that Plaintiffs claims for declaratory and injunctive relief are barred by the Eleventh Amendment because they seek relief for past violations without any evidence to support the existence of an ongoing violation. (*Id.* at 24.)

Sixth, Defendants argue that declaratory relief is not appropriate in this case because there has been no failure to provide Plaintiff access to the requested records and, given that all the requests are unique, the circumstances are unsuitable for any declaratory relief requiring a uniform response. (*Id.* at 25-26.)

Seventh, Defendants argue that Plaintiff's claims for relief are moot because Plaintiff has already been provided with access to all of the required records, Defendants have provided copies of those records where appropriate, and any delay in producing those copies was the result of Plaintiff's own actions. (*Id.* at 26-27.)

Eighth, Defendants argue that Plaintiff's request for injunctive relief should be dismissed because (a) there is no federally imposed obligation on Defendants to copy records for Plaintiff, (b) Plaintiff already has the ability to access the records and make copies themselves, and (c) the P&A statutes do not impose the copying and deadline requirements that Plaintiff seeks to have enforced through an injunction. (*Id.* at 27-28.)

### 2. Plaintiff's Opposition Memorandum of Law and Cross-Motion for Summary Judgment

Generally, in opposition to Defendants' motion, Plaintiff asserts six arguments. (Dkt. No. 25, Attach. 1 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that the P&A statutes do not require Plaintiff to allege that the inmates whose records were sought had a developmental disability or significant mental illness because they collectively protect people with all types of disabilities, and that Plaintiff is not required under those statutes to make any threshold showing of mental illness or developmental disability to exercise its access authority. (*Id.* at 20-23.)

Second, Plaintiff argues that it was not required to cite any specific statute when making its record requests, and therefore Defendants' arguments that they did not make requests pursuant to certain statutes are unfounded. (*Id.* at 23.)

Third, Plaintiff argues that it properly requested records for Inmates B through SS as their clients because those individual inmates all consented to Plaintiff's access of their records. (*Id.* at 23.)

Fourth, Plaintiff argues that the Complaint is not moot as a result of Defendants' actions in providing immediate physical access and some copies of records because Defendants have an ongoing practice of delaying access to copies and have not yet produced relevant records for Inmates A, Y, BB, LL, MM, NN, OO, PP, and QQ. (*Id.* at 23-24.)

Fifth, Plaintiff argues that its own actions have not contributed to Defendants' delays in producing the records, and that Defendants have routinely provided the records in a delayed manner beyond the time limits imposed by both the P&A statutes and Plaintiff's requests (specifically, between 10-58 days after payment has been provided by Plaintiff). (*Id.* at 24-25.)

Sixth, Plaintiff argues that Defendant Annucci should not be dismissed from this lawsuit because the delays and denials related to providing the requested records are part of a custom or practice of Defendant Annucci and the agency he oversees, and because Plaintiff is requesting

injunctive and declaratory relief rather than monetary relief. (*Id.* at 25-26.)

Seventh, Plaintiff argues that the Eleventh Amendment does not bar its claims because the relief sought is prospective in that it is based on continuing conduct. (*Id.* at 26-27.)

Additionally, in support of its cross-motion for summary judgment, Plaintiff asserts four arguments. (*Id.* at 9-17.) First, Plaintiff argues that it is entitled to summary judgment on its claims under the P&A statutes for the following reasons: (a) Defendants did not provide written notice within one business day of the expiration of the P&A statute deadlines with a reason for their delays or denials; (b) Plaintiff is entitled to access to copies of the requested records based on the plain language of the relevant statutes; (c) Defendants have refused to comply with the deadlines imposed by the P&A statutes, and Plaintiff in fact allowed them more time than required by those statutes to provide the copies of the records; (d) Defendants denied Plaintiff immediate access to Inmate A's records, particularly his autopsy report and updated death certificate; and (e) Defendants failed to provide access to RTF records such as demographic and statistical information despite the fact that Plaintiff had informed DOCCS that it was investigating allegations of abuse and neglect. (*Id.* at 11-17.)

Second, Plaintiff argues that it is entitled to summary judgment on its claims under 42 U.S.C. § 1983 because it has established that Defendants were acting under the color of state law and that they have deprived Plaintiff of a statutory right. (*Id.* at 18.)

Third, Plaintiff argues that it is entitled to declaratory relief because this case involves a legal dispute that turns purely on the meaning of statutes and regulations. (*Id.* at 18-19.)

Fourth, Plaintiff argues that it is entitled to a permanent injunction because (a) Defendants' denial of access to relevant records causes irreparable harm to Plaintiff's ability to investigate incidents of abuse and neglect under its federal mandate, (b) it has no other adequate

remedy at law to obtain these records from Defendants, and (c) Defendants continue to deny Plaintiff access to relevant records. (*Id.* at 19-20.)

3.  **Defendants' Combined Reply Memorandum of Law and Opposition Memorandum of Law**

Generally, in their reply and opposition memorandum of law, Defendants assert five arguments. (Dkt. No. 31 [Defs.' Reply Mem. of Law].) First, Defendants argue that their motion should be granted because Plaintiff has admitted that it was provided access to and copies of all records to which access was requested. (*Id.* at 4-5.)

Second, Defendants argue that Plaintiff's arguments as to the requested RTF information are inaccurate for the following reasons: (a) Plaintiff was provided with the information requested as part of a response to a similar FOIL request; (b) Plaintiff has not established a statutory basis for its asserted entitlement to some of these records; and (c) Plaintiff has not shown that it requested these records to investigate allegations of abuse and neglect as it now argues. (*Id.* at 5-8.)

Third, Defendants argue that Plaintiff has failed to establish the elements of its claims, in particular that the inmates in question had a requisite disability. (*Id.* at 8-14.)

Fourth, Defendants argue that Plaintiff's arguments improperly conflate the term "access to facilities" in the statutes with access to records, which requires a greater showing of the elements discussed in the P&A statutes, including disability and a client relationship. (*Id.* at 14-17.)

Fifth, and finally, Defendants argue that Plaintiff's request to supplement its claims should be denied because Plaintiff has now asserted facts related to new inmates that are not part of the Complaint. (*Id.* at 17-20.)

#### 4. Plaintiff's Motion to Supplement Its Statement of Material Facts

On April 8, 2019, Plaintiff filed a letter motion requesting the ability to supplement the statement of material facts related to the pending motions for summary judgment, in particular to add facts related to Defendants' actions in changing their policy for Plaintiff to request and obtain records from Defendants. (Dkt. No. 32.) On April 23, 2019, the Court granted this request. (Text Order filed Apr. 23, 2019.) Also on April 23, 2019, Plaintiff filed its supplemental statement of facts. (Dkt. No. 36.)

#### 5. Defendants' Supplemental Reply

In reply to Plaintiff's supplemental facts, Defendants assert two arguments. (Dkt. No. 40, Attach. 1.) First, Defendants argue that they have not changed their policy of offering immediate access to Plaintiff to the records it requests in that Plaintiff is still permitted to physically come to the facility and inspect the records. (*Id.* at 3-4.) Second, Defendants argue that they have not changed their policy of providing copies of records to Plaintiff at its request, because they still will provide such copies; the only change is that, rather than allowing Plaintiff to simply request page counts of the total available records (after which Plaintiff may determine whether or not it wishes to pay for all the records), they require Plaintiff to designate the specific records it wants copied. (*Id.* at 4-7.) Defendants argue that this change is intended to prevent wasted time by DOCCS employees and to facilitate faster provision of the relevant records Plaintiff requires to fulfil its duties as the P&A system for New York. (*Id.*)

## II. RELEVANT LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[33]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.[34]  Of course, when

a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there

has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted

automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above,

---

[33]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are
insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.
1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more
than simply show that there is some metaphysical doubt as to the material facts." *Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[34]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.)
(citing cases).

the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[35]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[36] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined

---

[35]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[36]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . .”); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Plaintiff's Motion to Use Pseudonyms

Simultaneous with the filing of its Complaint in this action, Plaintiff moved for permission to refer to the inmates referenced in the Complaint by pseudonyms (e.g., Inmate A, Inmate B, etc.) in order to protect their privacy.  (Dkt. No. 5.)

Approximately four months later, citing the same privacy concerns as in the motion to use pseudonyms, Plaintiff moved to seal the exhibits filed in connection with Defendants' motion and Plaintiff's own cross-motion for summary judgment.  (Dkt. No. 26.)  That same day, the Court granted Plaintiff's motion to seal.  (Dkt. No. 28.)

For the same reasons as stated by the Court in granting Plaintiff's motion to seal, the Court grants Plaintiff's motion to use pseudonyms.  (*Id.*)  As a result, in the analysis section of this Decision and Order, the Court will refer to the inmates by their pseudonyms, consistent with both parties' memoranda of law and supporting declarations.  The Court will also refer to the general facts in the sealed exhibits, without disclosing any specific medical or other information that might impact privacy.

### B.   Defendants' Motion for Summary Judgment

After carefully considering the matter, and for the reasons stated below, the Court (1) grants Defendants' motion to the extent it seeks to preclude Plaintiff from seeking prospective injunctive relief, (2) grants Defendants' motion to the extent it seeks to preclude Plaintiff from

seeking declaratory judgment that Defendants are obligated to comply with the access rights granted in the P&A statutes, (3) grants Defendants' motion to the extent that it regards Plaintiffs claims under the PAIMI Act as to Inmates B, C, E, F, G, H, I, J, K, M, N, R, U, V and GG, and (4) otherwise denies that motion.

> **1.     Whether Plaintiff's Requests for Declaratory and Injunctive Relief Are Barred by the Eleventh Amendment**

A suit against a state official in his or her official capacity for monetary damages is treated as a suit against the state, and therefore that official is protected by the doctrine of sovereign immunity under the Eleventh Amendment to the same extent as the state itself is protected. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). However, the doctrine of *Ex parte Young* permits a plaintiff to sue a state official in his or her official capacity for prospective equitable relief to remedy an ongoing violation of federal law. *Frew ex rel. Frew v. Hawkins*, 473 U.S. 159, 166 (1985). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland. Inc. v. Public Serv. Comm'n of Maryland.*, 535 U.S. 635, 645 (2002).

In its Complaint, Plaintiff requested three forms of equitable relief: (1) a declaratory judgment that Defendants have violated Plaintiff's rights under the P&A statutes; (2) a declaratory judgment that Defendants have an obligation to ensure that the access rights granted to Plaintiff by the P&A statutes are fully and uniformly implemented; and (3) a permanent injunction ordering Defendant to provide timely and complete responses to all outstanding and future record requests made by Plaintiff pursuant to its P&A authority. (Dkt. No. 1, at 24 [Plf.'s

Compl.].)

Plaintiff's first request for declaratory relief (seeking a declaratory judgment that Defendants have violated Plaintiff's rights under the P&A statutes) is not inherently prospective. *See McGinty v. New York*, 251 F.3d 84, 101 (2d Cir. 2001) (finding that a request for a retrospective declaration that defendant had violated federal law would be barred by the Eleventh Amendment). However, to the extent that such a declaration does not seek to impose a monetary penalty on the state for that past conduct and is based on a violation that is ongoing, the Court is not prevented by the Eleventh Amendment from making such a declaration. *Williston v. Eggleston*, 379 F. Supp. 2d 561, 578-79 (S.D.N.Y. 2005); *see also In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 376 (2d Cir. 2005) ("While [the request for declaratory judgment] asks the Court to declare the state officials' past and future actions illegal, that relief does not impose a past liability on the state."); *cf. Green v. Mansour*, 474 U.S. 64, 73 (1985) (finding declaratory judgment that defendants violated federal law in the past was not proper because there was no claimed continuing violation of federal law or any threat that state officials would violate the law in the future).

The Court finds that Plaintiff's Complaint has sufficiently alleged that the violation of its rights–namely, denial or delay of access to records requested pursuant to Plaintiff's P&A authority–is ongoing and/or that there is a threat Defendants will continue to violate these rights in the future. (*See, e.g.,* Dkt. No. 1, at ¶ 252 [Plf.'s Compl., alleging that "DOCCS denied and continues to deny DRNY access to P&A requests . . ."].)

While the Court need not look outside the four corners of the Complaint, to the extent it does so, it notes that, in rendering this finding, the Court does not place much reliance on Plaintiff's undisputed supplemental facts, which assert that Defendants have somewhat altered

43

and otherwise formalized (as a policy) the method by which they provide requested records to Plaintiff during the pendency of this litigation. *See, supra*, Part I.B.3. of this Decision and Order. Rather, the Court relies on the two instances, offered by Plaintiff in a letter, in which Plaintiff asserts it has been denied access since adoption of this formal policy: (1) one in which an employee of Plaintiff arranged to go to a facility to inspect the records of 17 clients, but was provided with access to only nine of those clients' records because the other clients (and their records) had been transferred to other facilities, and Defendants (despite knowing that Plaintiff was coming) had not previously informed Plaintiff of the transfers; and (2) one in which an employee of Plaintiff arranged to review a client's medical records, but, upon arriving at the facility, was provided with only the client's "active medical record" and was told that, because the additional records were unavailable for review, Plaintiff should make a written request to Ms. Sheehan for those records, after which Defendants would send Plaintiff an invoice for those records and send them upon receipt of payment by Plaintiff. (Dkt. No. 32, Attach. 1, at 1-2.) Although Defendants dispute that Plaintiff was denied physical access to any records, the Court is concerned, especially about this second instance, in which Plaintiff asserts it was in fact denied immediate physical access to certain records despite traveling to the relevant facility after arranging to inspect the records there and with no indication as to why those records could not be produced by Defendants for immediate physical inspection. Defendants have offered no explanation for why those other records were not available for review at that time despite this inspection having seemingly been prearranged and despite consistently alleging that it has always provided "immediate physical access to records." The Court therefore finds that, despite Defendants' formal policy that would appear to improve provision of access of the requested records over the policy that was in place during the time relevant to the motions for summary

judgment, Plaintiff has still sufficiently alleged that there is a continuing violation of federal law to surmount the Eleventh Amendment barrier as to this assertion for declaratory relief.

Plaintiff's other two requests for declaratory and injunctive relief are clearly prospective in that they seek to address Defendants' future compliance with the P&A statutes. (*See, e.g.*, Dkt. No. 1, at 24 [Plf.'s Compl.].) In addition, Plaintiff has sufficiently alleged (and established) that the potential violation of the federal right is ongoing through their allegations (and evidence) that Defendants have not yet provided, and continue to fail to provide, all of the records Plaintiff has requested. (*Id.* at ¶ 252.)

For all of these reasons, the Court finds that Plaintiff's requests for declaratory and injunctive relief are not barred by the Eleventh Amendment.

## 2.     Whether Plaintiff's Claims for Relief Are Moot

Defendants argue that Plaintiff's claims for relief are moot because they have offered access to all of the requested records and any delay in providing those records has been attributable to Plaintiff's actions. (Dkt. No. 15, Attach. 1, at 26-27 [Defs.' Mem. of Law].) The Court rejects Defendants' arguments that there is no live controversy remaining in this action, because (for the reasons discussed below) the Court finds that there remains a clear dispute between the parties as to (a) whether Defendants have provided Plaintiff access to *all* of the records that have been requested and (b) what constitutes "access" to records under the P&A statutes.

For all of these reasons, the Court finds that Plaintiff's claims are not moot.

## 3.     Whether Injunctive or Declaratory Relief Is Otherwise Available

As discussed above, Plaintiff has requested both declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, which is a well-established approach for P&A systems seeking to enforce

their statutory rights. *Office of Protection and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp.2d 303, 311-12 (D. Conn. 2003) (collecting cases).

### a. Request for Injunctive Relief

To obtain the prospective injunctive relief it seeks, Plaintiff must show "the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989). Furthermore, Plaintiff must actually succeed on the merits of its claim and cannot rest, as it may when seeking a preliminary injunction, on a mere showing of a likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

For purposes of this motion, this Court finds that Plaintiff has no other adequate remedy at law, and that Plaintiff would be irreparably harmed if it is "prevented from pursuing fully its right to access records" in furtherance of its statutory duties. *Armstrong*, 266 F. Supp. 2d at 311 (citing *Iowa Prot. & Advocacy Serv., Inc. v. Rasmussen*, 206 F.R.D. 630, 635 [S.D. Iowa 2001]); *see also Michigan Protection & Advocacy Serv., Inc. v. Evans*, 09-CV-12224, 2010 WL 3906259, at *5 (E.D. Mich. Sept. 30, 2010) (collecting cases in support of finding that irreparable harm results where plaintiff cannot fulfill its mandate under federal law, determine if there has been abuse or neglect, or make recommendations for changes to present future abuse or neglect because it has been denied access to records). Therefore, the key question before the Court is whether Plaintiff can show actual success on the merits of its claim that Defendant DOCCS has a policy and practice of denying or delaying access to records, in violation of the P&A statutes.

Beyond asserting conclusory allegations in its Complaint, Plaintiff has failed to allege (or establish) that such practice or policy existed during the time in question (or that it exists

now).  Indeed, the record before this Court shows that DOCCS made numerous attempts to

cooperatively develop a suitable arrangement with Plaintiff that would accommodate Plaintiff's

rights to access.  (*See, e.g.*, Dkt. No. 16, Attach. 1, at 1-2 [Ex. to Sheehan Decl., stating, "This

responds to your request to meet to discuss a protocol for DRNY facility visits and access to

records"].)

In situations where courts have granted injunctive relief to P&A systems, there has been

clear evidence of repeated denials of any access to records.  *See, e.g., Armstrong*, 266 F. Supp. 2d

at 321 (granting permanent injunction barring correctional facility, which had repeatedly denied

access, from refusing to give P&A system timely access to the records of eight inmates listed in

complaint, as well as "other similarly situated inmates"); *Disability Rights New York v. N.

Colonie Bd. of Ed.*, 14-CV-0744, 2016 WL 1122055, at *9 (N.D.N.Y. 2016) (Hurd,J.)

(permanently enjoining school district from refusing to respond to requests for access from P&A

system); *Advocacy Cntr. v. Stalder*, 128 F. Supp. 2d 358, 367-68 (M.D. La.1999) (noting that

injunctive relief is an "extraordinary remedy," and granting it where defendant had denied access

to the records of at least seven inmates who had complained under PAIMI and a temporary

restraining order had not curtailed defendant's behavior).  Such evidence has not been adduced in

this case.  Although Defendants engaged in delays in providing records for some inmates (as will

be discussed in detail below in this Decision and Order), it appears that Defendants have not yet

provided the requested requests only with regard to Inmate A, Inmate Y, Inmate BB, and the RTF

records.

To justify a prospective permanent injunction, Plaintiff needs to make a sufficient

showing that future violations are likely to occur.  *See Oklahoma Disability Law Ctr., Inc. v.

Dillon Family and Youth Svcs.*, 879 F. Supp. 1110, 1112 (N.D. Okla. 1995) (denying P&A

system's request for injunctive relief despite hospital's "consistent reluctance" to provide access to certain records). With limited exceptions discussed below in Part III.B.6. of this Decision and Order, the record before the Court demonstrates that Defendant DOCCS produced all documents responsive to the requests at issue in this proceeding as to most of the inmates–many of them before the filing of the Complaint. The most significant delays were attributed to clerical or processing errors, rather than to an intentional refusal to grant access. As a result, these problems of inadvertent delay would not be easily remedied by an injunction.

        Additionally, to the extent that Plaintiff now asserts that Defendants have continued to violate the P&A statutes (through their actions taken after the filing of the Complaint), such assertions do not provide the basis for showing a practice of denying Plaintiff's rights that will continue in the absence of an injunction. Plaintiff has not moved to supplement the Complaint to include these additional instances of alleged violations, and thus these additional requests are not squarely before the Court. Additionally, as also will be discussed below, the delays not attributable to inadvertence or mistake appear to have been the result of the modified request system that the parties had been using (seemingly at Plaintiff's behest), which, in lieu of requiring Plaintiff to go to the facilities and physically review the records to determine which records it would like copied, required Defendants to first send Plaintiff a page count of possibly responsive records which Plaintiff then uses to determine whether it wishes to pay for those pages and have Defendants copy them. It is undisputed based on Plaintiff's own addition of supplemental facts that, since January 2019, Defendants have modified this system to require Plaintiff to follow a procedure more consistent with that envisioned by the P&A statutes in which Plaintiff itself must inspect the records and determine which records it would like copied. Given that this formal procedure will actually make it more likely that Defendants will be able to

comply with the P&A deadlines, and given that Plaintiff has offered no persuasive evidence that it continues to suffer significant denials of access under this process, the Court cannot say that Plaintiff has established that future violations are likely to occur. Finally, although the Court has already noted that there has been one apparent instance of Defendants' not providing Plaintiff physical access to certain records since adoption of the formal procedure, the Court cannot say that this would provide a basis for granting the extraordinary remedy of a permanent injunction.

For all of these reasons, the Court finds that Plaintiff has not adduced admissible record evidence from which a rational fact finder could grant prospective injunctive relief to Plaintiff in this proceeding; and the Court accepts Defendants' argument that Plaintiff's request for injunctive relief is without merit, as a matter of law.

### b.     Request for Declaratory Relief

As discussed above, Plaintiff seeks both (1) a declaration that Defendants have violated Plaintiff's rights under the P&A statutes, and (2) a declaration that Defendants have an obligation to ensure that the access rights granted to Plaintiff by the P&A statutes are fully and uniformly implemented.

As recognized in Plaintiff's opposition memorandum of law, "a court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Savings Bank*, 977 F.2d 734, 734 (2d Cir. 1992). The ongoing dispute regarding Plaintiff's rights of access and Defendant's obligation to timely provide such access, and the need to resolve this dispute, is evident from the record. In particular, a declaration that Defendants' conduct in responding to Plaintiff's record requests up to now did or did not violate

the P&A statutes will no doubt help clarify what conduct complies with the statutes and relieve the parties from their uncertainty as to what is satisfactory under the P&A statutes as the parties continue to have dealings with each other.

Although Plaintiff's first request for declaratory judgment (i.e., that Defendants have violated Plaintiff's rights under the P&A Acts) serves a useful purpose, the Court finds that its second request for declaratory judgment (i.e., that Defendants are obligated to ensure that the access rights granted to Plaintiff by the P&A Acts are fully and uniformly implemented) does not. The parties do not dispute that Defendants are obligated to ensure access and comply with the P&A statutes. (*See, e.g.,* Dkt. No. 15, Attach. 1, at 25-26 [Defs.'s Mem. of Law] ["[T]here is no dispute that Plaintiff is entitled to access where authorized under the P&A Acts."].) It is axiomatic that a party who is subject to a law is obligated to comply with it or risk facing the consequences of violating that law. Thus, a declaration that Defendants are obligated to comply with the access rights in the P&A statutes adds nothing to the parties' understanding of the legal issues between them; it does not clarify any point of law or afford relief from any uncertainty underlying this action.

For all of these reasons, the Court denies Defendants' motion related to Plaintiff's request for a declaratory judgment that Defendants have violated Plaintiff's rights under the P&A statutes, but grants Defendants' motion related to Plaintiff's request for a declaratory judgment that Defendants are obligated to ensure that the access rights granted to Plaintiff by the P&A Acts are fully and uniformly implemented.

### 4. Whether Plaintiff's Claims Against Defendant Annucci Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative.

Plaintiff has brought its claims against Defendant Annucci solely in his official capacity. (Dkt. No. 1, at 1 [Plf.'s Compl.].) "[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n. 55 (1978). Described differently, "an official-capacity suit is, in all respects other than name, to be treated as a suit against [the government] entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original).

"Based upon the understanding that it is duplicative to name both a governmental entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Zuk v. Onondaga Cty.*, 07-CV-0732, 2010 WL 3909524, at *11 (N.D.N.Y. 2010) (Suddaby, J.) (internal quotations omitted); *see Kavanaugh v. Village of Green Island*, 14-CV-1244, 2016 WL 7495813, at *3 (N.D.N.Y. Dec. 30, 2016) (Sannes, J.) (dismissing official capacity claims against officer because the real party in interest was the city itself).

However, as Plaintiff notes, there is a wrinkle in this case: Plaintiff has not sought money damages but rather has sought only injunctive and declaratory relief. (Dkt. No. 25, Attach. 1, at 26 [Pl.'s Opp'n Mem. of Law].) The Supreme Court has noted that, for claims pursuant to 42 U.S.C. § 1983, although suits against state officials in their official capacity for damages are considered suits against the official's office and thus against the State itself, "official capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989). As a result, when the suit seeks prospective injunctive relief against a state official in their official capacity, such claims are not duplicative

of claims against the state entity. *See Barnett v. Baldwin Cnty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1236 (S.D. Ala. 2014) (declining to dismiss claims against defendants to the extent that plaintiffs brought claims for prospective injunctive relief); *Steinberg v. Gray*, 815 F. Supp. 2d 293, 298-99 (D. D.C. 2011) (dismissing claims for monetary damages against official capacity defendants as duplicative, but declining to dismiss claims for injunctive relief). As discussed above, the Court has found that the injunctive and declaratory relief requested by Plaintiff is prospective in nature.

For all of these reasons, the Court finds that the claims against Defendant Annucci (which are against him in his official capacity only and are for prospective injunctive and declaratory relief only) are not duplicative of the claims against Defendant DOCCS and should not be dismissed as duplicative.[37]

### 5. Whether Plaintiff Has Failed to Establish a Claim Pursuant to the Relevant P&A Statutes as a General Matter

Plaintiff's Complaint describes requests for records related to 34 different inmates across different DOCCS facilities, as well as records related to RTFs operated by Defendant DOCCS. With regard to each request, Plaintiff has asserted its authority to obtain the records pursuant to the P&A statutes–specifically the DD Act, the PAIMI Act, and the PAIR Act. As a result, the Court's determination of whether Plaintiff has established a claim will depend upon the language

---

[37] The Court notes that, although Defendants alternatively argue that the claims against Defendant Annucci must be dismissed because Plaintiff has not shown that Defendant Annucci was personally involved in the alleged violations, such showing of personal involvement is not required where a defendant is being sued in his official capacity only. *See Cabassa v. Oshier*, 11-CV-1237, 2013 WL 1183296, at *8 (N.D.N.Y. Mar. 21, 2013) (D'Agostino, J.) ("A plaintiff asserting a § 1983 claim against a supervisory official in his *individual capacity* must allege that the supervisor was personally involved in the alleged . . . deprivation.") (emphasis added). Because Defendant Annucci has been sued only in his official capacity, a lack of personal involvement is not a basis for dismissal.

of those P&A statutes.

Statutory interpretation must "begin with the plain language, giving all undefined terms their ordinary meaning while attempt[ing] to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015) (internal quotation marks and citation omitted); *Disability Rights New York v. Wise*, 171 F. Supp. 3d 54 (N.D.N.Y. 2016) (Sharpe, J.). If a statutory provision is ambiguous, the court must "then turn to canons of statutory construction for assistance in interpreting the statute." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015). "These include looking to the purpose of [the statute], and affording some degree of weight to the interpretations of the agencies charged with enforcing it." *Greathouse*, 784 F.3d at 113.

### a.    DD Act and PAIR Act

The DD Act applies to persons with developmental disabilities, as defined at 42 U.S.C. § 15002(8). It authorizes disclosure of individual patient records to P&A systems pursuant to 42 U.S.C. § 15043(a)(2)(I), which specifically provides, in relevant part, for access to all records of the following individuals:

> **(i)** any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
>
> **(ii)** any individual with a developmental disability, in a situation in which–
>
>> **(I)** the individual, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;
>>
>> **(II)** the individual does not have a legal guardian,

53

> conservator, or other legal representative, or the legal
> guardian of the individual is the State; and
>
> **(III)** a complaint has been received by the system about the
> individual with regard to the status or treatment of the
> individual or, as a result of monitoring or other activities,
> there is probable cause to believe that such individual has
> been subject to abuse or neglect . . . .

42 U.S.C. § 15043(a)(2)(I) (emphasis in original).

> In addition, the DD Act authorizes P&A systems to have the following access:

> **(i)** have access to the records of individuals described in
> subparagraphs (B) and (I), and other records that are relevant to
> conducting an investigation, under the circumstances described in
> those subparagraphs **not later than 3 business days** after the
> system makes a written request for the records involved; and

> **(ii)** have immediate access, **not later than 24 hours** after the
> system makes such a request, to the records without consent from
> another party, in a situation in which services, supports and other
> assistance are provided to an individual with a developmental
> disability–

>> **(I)** if the system determined there is probable cause to
>> believe that the health or safety of the individual is in
>> serious and immediate jeopardy; or

>> **(II)** in any case of death of an individual with a
>> developmental disability . . .

42 U.S.C. § 15043(a)(2)(J) (emphasis supplied)

> The regulation implementing requests under the DD Act provides as follows:

> A P&A shall be permitted to inspect and copy information and
> records, subject to a reasonable charge to offset duplicating costs.
> If the service provider or its agents copy the records for the P&A
> system, it may not charge the P&A system an amount that would
> exceed the amount customarily charged other non–profit or State
> government agencies for reproducing documents.  At its option, the
> P&A may make written notes when inspecting information and
> records, and may use its own photocopying equipment to obtain
> copies.  If a party other than the P&A system performs the

> photocopying or other reproduction of records, it shall provide the
> photocopies or reproductions to the P&A system within the time
> frames specified in paragraph (c) of this section. In addition,
> where records are kept or maintained electronically they shall be
> provided to the P&A electronically.

45 C.F.R. § 1326.25(d).

The PAIR Act was created by Congress in an amendment to the Rehabilitation Act of 1973, and is codified at 29 U.S.C. § 794e.[38] PAIR applies to persons with disabilities who do not have a developmental disability and are not persons with mental illness, and creates an "identical framework" as the DD Act. *See State of Conn. Office of Protection and Advocacy for Persons with Disabilities v. Hartford Bd. of Ed.*, 355 F. Supp.2d 649, 654 (D. Conn. 2005). It authorizes a P&A system to have the same access rights as the DD Act. 29 U.S.C. § 794e(f)(1)-(2); *Hartford Bd. of Ed.*, 355 F. Supp.2d at 657.

### b.    PAIMI Act

The PAIMI Act applies to persons with mental illness, as defined in 42 U.S.C. § 10802(4). It provides, in relevant part, for access to all records of the following individuals:

> **(A)** any individual who is a client of the system if such individual,
> or the legal guardian, conservator, or other legal representative of
> such individual, has authorized the system to have such access;
>
> **(B)** any individual (including an individual who has died or whose
> whereabouts are unknown)–
>
> > (i) who by reason of the mental or physical condition of
> > such individual is unable to authorize the system to have
> > such access;
> >
> > (ii) who does not have a legal guardian, conservator, or

---

[38]    In its requests to DOCCS, DRNY did not mention the PAIR Act by name, but referenced the Rehabilitation Act Amendments of 1992, as set out in 29 U.S.C. § 794e. (*See, e.g.,* Dkt. No. 16, Attach. 1, at 11.)

other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect . . . .

42 U.S.C. § 10805(a)(4) (emphasis in original).

Unlike the DD Act, the PAIMI Act does not specify a timeline for providing access. However, the implementing regulation requires that such access shall be provided "promptly." 42 C.F.R. § 51.41(a).[39]  Moreover, the regulation does not contain language similar to 45 C.F.R. § 1326.25(d) about third-party copying or the imposition of a certain time restraint on the provision of copies; rather, it states only that "[a] P&A system shall be permitted to inspect and copy records, subject to a reasonable charge to offset duplicating costs."  42 C.F.R. § 51.41(e).

### c.     Whether Plaintiff Is Required to Identify an Inmate's Developmental Disability or Mental Illness in Its Requests Pursuant to the P&A Acts

Defendants argue that they had no obligation to provide access to records for any of the individual inmates listed in the Complaint because (1) Plaintiff did not identify the inmates' developmental disability or mental illness in its record requests, and (2) DOCCS had no records of a disability for some of the inmates whose records were requested by Plaintiff.  (Dkt. No. 15,

---

[39]     In addition, another implementing regulation provides that, "[i]f a P&A system's access to facilities, programs, residents or records covered by the Act or this part is delayed or denied, the P&A system shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness.  Access to facilities, records or residents shall not be delayed or denied without the prompt provision of written statements of the reasons for the denial."  42 C.F.R. § 51.43.

Attach. 1, at 8 [Defs.' Mem. of Law].)

When making a request for access, a P&A system is not required to expressly include a showing of the developmental disability or mental illness of the individual whose records are sought. *Armstrong*, 266 F. Supp. 2d at 314. Indeed, imposing such a threshold requirement would appear inconsistent with the purposes of the P&A statutes. *See Kentucky Prot. & Advocacy Div. v. Hall*, 01-CV-0538, 2001 WL 34792531, at *2 (W.D. Ken. 2001) ("Demanding a conclusive, individualized showing of developmental disability or mental illness before permitting entry would reserve to Defendant a gate-keeping function contrary to the specific terms and general purpose of the Acts."). As a result, several courts to consider this issue have held that "evidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill is sufficient under PAIMI to merit access by [a P&A system]." *See, e.g., Armstrong*, 266 F. Supp. 2d at 314 (collecting cases); *accord, Ohio Legal Rights Serv. v. Buckeye Ranch*, 365 F. Supp. 2d 877, 885 (S.D. Oh. 2005) (citing cases). Given the similar framework shared by the three P&A statutes, the same rationale would apply to the DD Act and PAIR Act.

The fact that DOCCS houses at least some individuals with developmental disabilities and/or mental illness is evident from the record and has never been contested by Defendants. Moreover, Defendants have cited no legal authority to support their contention that Plaintiff was required to include a specific assertion or information about each inmate's developmental disability or mental illness in its record requests. (Dkt. No. 15, Attach. 1, at 8-9 [Defs.' Mem. of Law]; Dkt. No. 31, at 8-9 [Defs.' Reply Mem. of Law].)

For all of these reasons, the Court finds that, in the absence of evidence that any of the inmates' status has been misrepresented, Plaintiff is not required to identify an inmate's

57

developmental disability or mental illness in its requests pursuant to the P&A Acts.

> **d.** **Whether Plaintiff Has Adequately Identified Each Inmate as a "Client" in Its Record Requests in this Proceeding**

Defendants correctly note that Plaintiff expressly identified only three inmates as "clients" in its various request letters. (Dkt. No. 16, Attach. 1, at 211, 221, 236.) Defendants argue that, therefore, the remaining 31 inmates must not have been clients, and Plaintiff was not entitled to their records. The Court must reject this argument.

As a P&A system, Plaintiff has authority to access the records of "any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access. 42 U.S.C. § 10805(a)(4)(A). For all living inmates, Plaintiff has included an authorization form with its request, purported to be signed by the respective inmate, and it is undisputed that these inmates authorized Plaintiff to access their records. (*See, e.g.*, Dkt. No. 16, Attach. 1, at 30, 38, 55.) Defendants have not offered any facts that would give the Court any reason to doubt the authenticity of those signed authorization forms.[40] In addition, again, Defendant has not cited any legal authority to support its contention that Plaintiff was obligated, as a threshold matter, to specifically identify each inmate as its client in the record requests to be entitled to access those inmates' records. (Dkt. No. 15, Attach. 1, at 9-10 [Defs.' Mem. of Law].)

Inmate A was deceased at the time that Plaintiff made its records request. However, a

---

[40] Defendants note inconsistent language in Plaintiff's supporting declarations that suggest that Inmates G, H, and I may not have actually signed their authorization form; however, Defendants fail to support this argument with any record evidence. (Dkt. No. 25, Attach. 15, at ¶¶ 10-13 [Landriscina Decl.]; Dkt. No. 31, Attach. 1, at ¶ 82 [Def. Response to Pl.'s Statement of Material Facts].) Moreover, the record does not suggest that Defendants raised any concerns about the legitimacy of the authorizations prior to this litigation, including when providing records for these inmates.

P&A system is authorized to access the records of "any individual (including an individual who has died or whose whereabouts are unknown) . . . who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access." 42 U.S.C. § 10805(a)(4)(A).

Defendants have not suggested how Plaintiff would demonstrate, to Defendants' satisfaction, that the inmates whose records were being requested were actually "clients" of the P&A system. The term "client" is not defined in either the P&A statutes or the regulations. *See, e.g.*, 45 C.F.R. § 1326.19. Black's Law Dictionary defines "client" as "[a] person or entity that employs a professional for advice or help in that professional's line of work." *Client*, Black's Law Dictionary (11th ed. 2019). Merriam-Webster Dictionary defines "client" as (a) one under the protection of another, (b) a person who engages the professional advice or services of another, (c) a customer, and (d) a person served by or utilizing the services of a social agency. *Client*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/client (last visited Sept. 19, 2019). Given that one of the commonly understood definitions of "client" is a person who is served by a social agency and the fact that it is undisputed that the identified inmates authorized Plaintiff to access their records, the Court cannot find that Defendants have offered any evidence to create a genuine dispute of material fact as to whether Plaintiff was acting under the proper authority to request the inmates' records in this respect. Nor have Defendants established, as discussed above, that there is any legal requirement for Plaintiff to explicitly state in its request that the inmate in question is its client in order for the request to be proper.

Finally, while it would certainly be prudent for a P&A system to offer a service provider proof of a client relationship, the apparent purpose of the access provisions appears inconsistent

with the strict approach suggested by Defendants. *See Wise*, 171 F. Supp. 3d at 60 ("Clearly, the purpose of the statutes weighs in favor of robust disclosure."); *Alabama Disabilities Advocacy Program v. J.S. Tarwater Dev. Ctr.*, 97 F.3d 492, 497 (11th Cir. 1996) ("[I]t is clear that the [DD Act] provides express authority for P&As to gain broad access to records, facilities and residents to ensure that the Act's mandates can be effectively pursued."); *Robbins v. Budke*, 739 F. Supp. 1479, 1488 (D.N.M.1990) ("Access to patient records is necessary for P&A [system] to serve its clients, evaluate its clients' concerns, and determine whether a client has a legal claim.").

For all of these reasons, the Court finds that Plaintiff has adequately identified each inmate as a "client" in its record requests in this proceeding.

> **e.** **Whether a Service Provider's Offer of Physical Inspection and Copying of Records by a P&A System Necessarily Completes Its Obligation Under the DD Act and PAIR Act**

Plaintiff admits that, with the exception of records related to the death of Inmate A, Defendants have never denied Plaintiff physical access to its facilities in order to review and copy records potentially responsive to Plaintiff's requests. Indeed, Defendants typically offered Plaintiff unrestrictive access to review records at the respective facility in their initial responses to Plaintiff's written requests for records. (Dkt. No. 15, Attach. 3, at ¶¶ 20, 56, 94 [Sheehan Decl.].) Generally, such access is consistent with Defendants' obligations pursuant to the DD Act and PAIR Act.

However, the Court is not convinced by Defendants' arguments that allowing Plaintiff such physical access and copying was itself the end of Defendants' obligations under the DD Act and PAIR Act. As discussed previously, a regulation implementing the DD Act (and, by extension, the PAIR Act) states that,"[i]f a party other than the P&A system performs the photocopying or other reproduction of records, it shall provide the photocopies or reproductions

to the P&A system within the time frames specified in paragraph (c)" (which is within three business days after receipt of the written request from the P&A system). 45 C.F.R. § 1326.25(d). The regulation does not require the P&A system itself to perform the copying of the records; the records may be copied by a third-party (including a service provider). As a result, the mere fact that Defendants provided Plaintiff immediate physical access and copying does not, by itself, answer the question of whether Defendants' conduct related to copying the records constituted a denial of Plaintiff's rights under the DD Act and the PAIR Act (to the extent it grants the same access rights as the DD Act).[41]

### 6. Whether Defendants Violated Plaintiff's Access Rights Pursuant to the P&A Statutes as to Plaintiff's Individual Record Requests

#### a. Whether DOCCS' Failure to Review, Collate and Copy Documents in Accordance with Plaintiff's Amended Deadlines Under the Circumstances Violates the P&A Acts

Plaintiff's Complaint does not allege, and Plaintiff does not establish, a refusal to provide access to, or a failure to provide copies of, records. Instead, for each of the requests at issue in the Complaint, Plaintiff requested that DOCCS locate and identify records responsive to its request, provide a page count and cost estimate for reproduction of those records, and produce those copies upon Plaintiff's payment of reasonable costs. (See, e.g., Dkt. No. 25, Attach. 9, at ¶¶ 3-8 [Charland Decl.].) Typically, Plaintiff imposed its own deadline for fulfilling the record requests, one that was longer than the statutory or regulatory deadlines.

Plaintiff argues that Defendants violated the P&A statutes by (1) failing to provide cost

---

[41] The Court notes that, as stated earlier, the relevant regulation implementing the PAIMI Act, 42 C.F.R. § 51.41, does not contain language similar to 45 C.F.R. § 1326.25(d) about third-party copying or the imposition of a certain time restraint on the provision of copies; rather, it states only that "[a] P&A system shall be permitted to inspect and copy records, subject to a reasonable charge to offset duplicating costs." 42 C.F.R. § 51.41(e).

estimates and copies within the Plaintiff-imposed deadlines set out in its requests, (2) failing to

provide cost estimates and copies within the deadlines set forth in the DD Act and accompanying

regulations, and (3) failing to provide cost estimates and copies within the deadline set forth in

the PAIMI Act and accompanying regulations. The Court rejects this argument, because it is

unsupported by the plain language of the P&A statutes, the regulations implementing those

statutes, and the rules of statutory construction.

As set forth above, the P&A statutes speak in general terms of "access" to records, in

order that a P&A system may fulfill its investigatory and advocacy role for individuals with

disabilities. With regard to the regulation implementing the DD Act excerpted above in Part

III.B.5.a. of this Decision and Order (i.e., 45 C.F.R. § 1326.25[d]), generally, the first sentence of

the regulation sets forth the procedure permitted: an inspection by the P&A system and (if

desired by the P&A system) copying by someone. The second sentence addresses the

circumstance of when copying is done by the service provider or its agents. The third sentence

addresses the circumstance of when copying is done by the P&A system. The fourth sentence

addresses the circumstance of when copying is done by a party other than the P&A system

(whether that be the service provider, its agents, or an agent of the P&A system).

Based on the plain language of the regulation, the Court finds that a prerequisite of the

P&A system's right to obtain copies of the information and records of an individual is the P&A

system's inspection of the information and records. For example, the noun "records" contained

in the second, third and fourth sentences is best understood as referring to the "inspect[ed]"

records contained in the first sentence. (Indeed, the "records" referenced in the third sentence are

expressly those records "inspect[ed]" by the P&A system.) This makes sense because, otherwise,

how could the service provider, P&A system or third-party have in their hands the precise

records that the P&A system wants (and is authorized to have) copied and provided, as opposed to some other sensitive records?[42]  Simply stated, a right of the P&A system to obtain copies of the records of an individual within three business days merely by sending a written demand to the service provider (when neither the P&A system nor the service provider has yet located and gathered, or re-located and re-gathered, those records) is not reasonably set forth in this regulation, based on its plain language.

In essentially interpreting the term "inspect and copy" to mean "inspect then copy," the Court is persuaded by the analysis set forth in *Waller v. Bryan*, 16 S.W.3d 770 (Tenn. Ct. App. 2000), which applied language contained in the Tennessee Public Records Act permitting a citizen to "inspect[] or copy[]" public records, and language contained in Rule 16 of the Tennessee Rules of Criminal Procedure permitting a criminal defendant to "inspect and copy" papers and documents.  After construing both terms to mean inspect *then* copy, the Tennessee Court of Appeals focused its analysis on whether the term "inspect" means only a personal physical inspection by the party making the request or also a de facto inspection (on behalf of the party requesting the record) by the party possessing the record.  *Waller*, 16 S.W.3d at 774, 776 (emphasis added).  In construing the term "inspect" to also include a de facto inspection by the

_____

[42]     In response to an argument by Plaintiff that (as a policy matter) a P&A system should not have to inspect sensitive records before a service provider must produce them to it, the Court must respectfully disagree: permitting the considerable trust bestowed upon a P&A system by both federal and state government to be cavalierly treated by that P&A system is neither necessary for that system to achieve its noble mission nor conducive to good government, especially given the fact that no man or woman is an angel. *See* The Federalist No. 51 (James Madison) ("If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.").

party possessing the record, the Tennessee Court of Appeals refused to "place form over substance":

> It is this Court's duty to apply rather than construe the language of the Public Records Act, since the intent of the Legislature is represented by clear and unambiguous language. . . . If the citizen requesting inspection and copying of the documents can sufficiently identify those documents so that Appellees know which documents to copy, *a requirement that the citizen must appear in person to request a copy of those documents would place form over substance and not be consistent with the clear intent of the Legislature*. . . . If a citizen can sufficiently identify the documents which he wishes to obtain copies of so as to enable the custodian of the records to know which documents are to be copied, the citizen's personal presence before the record custodian is not required. However, the records custodian is not required under the Public Records Act to make the inspection for the citizen requesting the documents.

*Waller*, 16 S.W.3d at 774, 776 (emphasis added).

The Court construes the relevant statutes and regulation in a similar fashion. In so doing, the Court is aware of the fact it is construing the term "P&A system" to implicitly mean "P&A system or its agents," although the regulation explicitly uses the terms "service provider or its agents" and "party other than the P&A system" (suggesting that, when the Department of Health and Human Services intends to mean "P&A system or its agent," it knows how to express that idea). 45 C.F.R. § 1326.25(d). However, the Court is also aware that the rule of *expressio unius est exclusio alterius* is a mere presumption that is overcome by a contrary legislative intent. 2A *Sutherland Statutory Construction* § 47:25 (7th ed.). Here, the Court finds that one of the clear intents of the DD Act (and PAIR Act) was to protect vulnerable populations from abuse or neglect (without unnecessarily subordinating various privacy requirements). *Disability Law Ctr. of Ala., Inc. v. Anchorage Sch. Dist.*, 581 F.3d 936, 940 (9th Cir. 2009). Furthermore, the Court finds that one of the clear intents of the regulation's inspection requirement was to prevent the

service provider from wasting time and money, and accidently disclosing sensitive records, by being forced (at its peril) to perform an endless search through voluminous records for a document that has been insufficiently identified by the P&A system. *Cf. Allen v. Day*, 213 S.W.3d 244, 250 (Tenn. Ct. App. 2006) ("[T]he purpose of the personal appearance requirement is to prevent wasted governmental time and money caused by the endless search through voluminous records for a document which was insufficiently identified by the petitioner."). As a result, the Court finds that the clear intent of the statutes and relevant regulation rebut the presumption created by the rule of *expressio unius est exclusio alterius.*

Here, Plaintiff's preferred method of obtaining records,[43] as outlined in the Complaint, arguably goes beyond the type of "inspect[ion]" expressly contemplated by the regulation. As described by Defendants, each request required DOCCS staff to "physically retrieve and review physical files from [several locations within the facility], ascertain what records are responsive, and then physically count the responsive pages. Depending on the nature of the request, this could trigger multiple searches at multiple facilities for the requested records." (Dkt. No. 15, Attach. 3, at ¶ 14 [Sheehan Decl.].) Once this search process was complete, DOCCS was able to send an accurate estimate of copying costs to Plaintiff, which Plaintiff then chose whether or not to pay in order to obtain the records.

As also described by Defendants, DOCCS staff had to engage in this labor-intensive process twice: a second time after Plaintiff had agreed to pay for the copies. Upon receipt of payment, "the DOCCS staff member who provided the page count, . . . [had to] then go back to

---

[43]     The record shows that Plaintiff occasionally physically inspected records at DOCCS facilities, and tagged those records for copying. (Dkt. No. 16, Attach. 1 at 91.) The Complaint does not assert any claims related to those occasions.

the physical files and physically make the copies. Due to the lack of technological resources . . .

making or storing copies in advance of payment . . . [was] still less practical (since payment . . .

[was] optional) then returning to obtain the records from the physical files." (*Id*. at ¶ 17

[Sheehan Decl.].) Although such a two-step approach may seem on its face inefficient, the Court

finds it was entirely reasonable in light of the sensitive nature of the documents, the nature of the

facility and the potential for several weeks to pass between delivery of the cost estimate and

receipt of payment, as documented in the record before this Court.

Indeed, Plaintiff appears to recognize the additional burdens that it was attempting to

impose on DOCCS (and the fact that it had perhaps stepped outside of the protection of 45

C.F.R. § 1326.25[d]), because it frequently requested that documents be produced within *seven*

business days of payment, a period more than double that imposed by the DD Act or PAIR Act.

Moreover, as Defendants argue in their supplemental reply memorandum of law, requiring

Plaintiff to come to the facilities, inspect the records, and determine which records they require to

be copied ensures that Defendants are better able to process Plaintiff's record requests in the time

required by the P&A statutes; in particular, it ensures that only those sensitive records that

Plaintiff has determined are relevant are copied, and that all those records are immediately

available to DOCCS staff to process and provide to Plaintiff once Plaintiff has conducted its

review.

Given that the parties appear to have been following an approach different from that

contemplated by the DD Act and PAIR Act, the Court cannot find that the amended deadlines for

producing the records imposed by the DD Act and PAIR Act should automatically be imposed

against Defendants. Rather, the Court finds that this portion of the case turns on the threshold

issue of whether a rational fact finder could conclude that Plaintiff's act of persuading

66

Defendants to retrieve, review and count the records, and report their page number (without providing a verbatim or even detailed description of the records to Plaintiff), constituted a de facto "inspection" by an agent of Plaintiff under the relevant regulation.

With regard to the PAIMI Act, courts that have considered the issue have held that "the parties may use the deadlines in the DD Act as a guideline for requests under the PAIMI Act, but this approach should reflect a good faith analysis of the nature and extent of the request. A narrow request for a small number of documents should not require the full three days allowed under the DD Act, while a very broad and time intensive request should be allowed some leeway." *Protection & Advocacy Sys., Inc. v. Freudenthal*, 412 F. Supp.2d 1211, 1220-21 (D. Wy. 2006) (approving alternate access agreement between P&A system and hospital as consistent with P&A statutes); *cf. Michigan Prot. & Advocacy Svc., Inc. v. Flint Community School*, 146 F. Supp. 3d 897, 908 (E.D. Mich. 2015) (determining that school records should be provided within five days of request in order to satisfy the PAIMI Act).

Because the parties have been operating under a modified process and schedule of Plaintiff's own devising, the Court must consider whether Defendants' actions in responding to Plaintiff's record requests were reasonably taken in good faith, to the extent that Plaintiff's claims arise under the PAIMI Act. More specifically, applying the "good faith" requirement described by the *Freudenthal* decision, the Court finds that, in assessing whether Defendants violated Plaintiff's rights under the PAIMI Act in denying or delaying copies of the requested records, it is most prudent to consider whether Defendants provided the requested records according to the modified approach the parties adopted without any excessive delay that would thwart the purpose of the PAIMI Act.

### b.    Inmate A Records

DOCCS refused to provide Plaintiff with copies of Inmate A's death certificate and autopsy report, indicating that it could not do so without a valid HIPAA authorization. This denial appears to violate the P&A statutes. It is well established that HIPAA does not apply to an otherwise valid request pursuant to the P&A statutes. *Freudenthal*, 412 F. Supp. 2d at 1216-17 (holding that HIPAA privacy protections do not prohibit disclosure of "protected health information" in response to valid request from P&A system); *Ohio Legal Rights Svc. v. Buckeye Ranch, Inc.*, 361 F. Supp. 2d 877, 889 (S.D. Ohio 2005) (holding that requests pursuant to P&A statutes fell under HIPAA exception for disclosures required by law). Nor have Defendants provided any authority to support their arguments that these records were either not covered under the P&A statutes or that Plaintiff was required to explain why "its investigation seemingly went inactive for two years" before they made the second request for these records. (Dkt. No. 15, Attach. 1, at 15-16 [Defs.' Mem. of Law].) Plaintiff had previously requested these records after Inmate A's death related to an investigation into that death, but Defendants could not provide them at that time because they were not yet ready; thus, even if Defendants' argument had merit, the Court finds that a reasonable fact finder could conclude that Plaintiff had sufficiently made its need for those documents related to their investigation clear on the basis of its past request, no matter the time that had passed between the two requests.

However, it appears that there is a genuine dispute of material fact as to whether DOCCS was the appropriate source to provide this information. Ms. Sheehan's declaration indicates that, in denying Plaintiff's request for these documents, Defendants twice referred Plaintiff to seek them from the state Department of Health and the relevant-county coroner's office. *See Sonnenberg v. Disability Rights Idaho, Inc.*, 168 F. Supp. 3d 1282, 1301 (D. Idaho 2016) (ordering coroner to provide copy of autopsy report in response to P&A system request). It is not

clear that Plaintiff ever made a request for these documents from the Department of Health and the county coroner as suggested.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate A's records because a genuine dispute of material fact exists as to whether (a) Defendants were in possession of the requested records, (b) Defendants were the entity entitled to release those records, and (c) Defendant denied Plaintiff access to these records.

### c. RTF Investigation

On March 26, 2018, Plaintiff requested records related to DOCCS' facilitation of RTF services under its P&A authority. On April 5, 2018, DOCCS informed Plaintiff that DOCCS was consolidating Plaintiff's records request of March 26, 2018, with a prior New York State Freedom of Information Law ("FOIL") request submitted on March 9, 2018. (Dkt. No. 15, Attach. 3, at ¶¶ 40-41 [Sheehan Decl.].) On May 11, 2018, DOCCS provided some records related to the RTFs that were described as responsive to the FOIL request, but DOCCS did not reference the P&A statutes in the accompanying correspondence. The Court notes that, although the requests pursuant to FOIL and the P&A statutes are nearly identical in terms of the information they seek, the P&A statute request provides more specifics as to what information is sought under the first and third categories in that request than provided in the FOIL request. (*Compare* Dkt. No. 16, Attach. 1, at 10 [FOIL Request] *with* Dkt. No. 16, Attach. 1, at 12[P&A Request].) In addition, the response to the "consolidated" requests lists the information sought in the FOIL request, but does not note the additional specifics sought in the P&A statutes request. (Dkt. No. 16, Attach. 1, at 14-15.) Based on the evidence in the record, it is simply not clear whether DOCCS has provided all documents responsive to Plaintiff's P&A request as part of the response to the FOIL request. The Court notes that, with regard to one of Plaintiff's requests,

Defendants' response was to state that DOCCS does not track which inmates in an RTF are past their conditional release date and that producing such information would require "a comprehensive, manual search of every inmate record"; it is apparent from the response that Defendants did not conduct such a manual search and thus did not provide this information. (Dkt. No. 16, Attach. 1, at 14-15.)

In an effort to mitigate this lack of evidence supporting Defendants' argument that it provided all of the requested records, Defendants argue that (1) Plaintiff did not make the request pursuant to inmate complaints about abuse or neglect and thus were not authorized to obtain that information, and (2) Plaintiff did not request records, but rather information through "interrogatories," despite the fact that the PAIMI Act allows access to only the records of individuals. (Dkt. No. 15, Attach. 1, at 21-23 [Defs.' Mem. of Law].)

The information requested by Plaintiff, although it does not relate to a specific inmate, is not necessarily outside the scope of the PAIMI Act because the Act allows access to records of individuals where "[a] complaint or report has been received and the P&A system has determined there is probable cause to believe that the individual has been or may be subject to abuse or neglect." 42 C.F.R. § 51.41(b)(iii). Here, it is undisputed that Plaintiff received complaints (although it is disputed as to whether those complaints were regarding abuse or neglect). Additionally, the records request at issue seeks demographic information identifying individuals being held under certain conditions in the RTFs, and thus does seek to access information about individuals. As to Defendants' argument that Plaintiff has not sufficiently shown that its request was based on a belief about abuse or neglect, some courts have limited attempts to show that a P&A system lacked probable cause to commence such an investigation. *See Armstrong*, 266 F. Supp. 2d at 321 (requiring a P&A system to demonstrate that probable

cause exists "prior to having access to patients, personnel, and records is burdensome and unnecessary").[44] While the Court respectfully views with a suspicious eye the notion that the government possesses the authority to confer on a private entity the right to evade judicial review of the entity's probable-cause determinations, the Court must reject as unsupported Defendants' belief that Plaintiff lacked probable cause to request the information in question, or that such a lack of probable cause warranted Defendants' failure to provide the requested information, under the circumstances.

A question remains, therefore, regarding whether the specific information sought by Plaintiff in its request is encompassed within the scope of what a P&A system is entitled to under the PAIMI Act. The access regulation related to the PAIMI Act indicates that the information and individual records covered by the PAIMI Act includes "[p]rofessional, performance, building or other safety standards, [and] demographic and statistical information relating to the facility." 42 C.F.R. § 51.41(c)(5).[45] Defendants offer no argument as to why Plaintiff's requests for information about the number of "non-SARA inmates who have RTF status" as a result of a

_____

[44]    *Cf. Arizona Ctr. for Disability Law v. Allen*, 197 F.R.D. 689, 693 (D. Ariz. 2000) (finding that the P&A system is the "final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that may have been subject to abuse or neglect"); *Matter of Disability Rights Idaho Request for Ada Cnty. Coroner Records Relating to the Death of D.T.*, 168 F. Supp. 3d 1282, 1297 (D. Id. 2016) ("Federal cases are clear that the P&A is the final arbiter of probable cause, and that an entity may not second-guess the P&A's probable cause determination in order to withhold records.") (collecting cases).

[45]    Defendants argue in their reply memorandum of law that the Court should decline to consider this regulation because Plaintiff did not refer to it in its request for information. The Court must reject this argument. Whether or not Plaintiff cited this specific regulation in its request, Plaintiff clearly cited to the PAIMI Act as the authority for its request, and the PAIMI Act is the basis for this particular regulation. Moreover, Defendants cite no authority that would suggest that the Court should (or indeed can) simply ignore relevant statutory or regulatory authority based on a litigant's failure to cite it.

special condition of release, and the number of inmates in custody past their conditional or open release dates pending placement in a state program or facility for persons with mental health or developmental disabilities (including, for both requests, the current facility location of those persons, their housing area, their mental health service level, and their county of commitment), are beyond the scope of demographic and statistical information that is allowable under 42 C.F.R. § 51.41(c)(5); such information would ostensibly be contained within the records of those individuals.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Plaintiff's requested records related to DOCCS' facilitation of RTF services, because a genuine dispute of material fact exists as to whether (a) there are additional relevant records related to RTF services that have not been provided to Plaintiff and (b) Defendant denied Plaintiff access to these records.

### d.    Inmate B Records

Plaintiff and DOCCS exchanged significant correspondence regarding two separate record requests with regard to Inmate B. The first, dated February 15, 2018, sought copies of "all medical records" related to Inmate B. (Dkt. No. 16, Attach. 1, at 16-17.) DOCCS responded on February 22, 2018, seeking a valid HIPAA authorization. (*Id*. at 20.) On March 9, 2018, Plaintiff provided the requested HIPAA authorization. (*Id*. at 23.) DOCCS responded with a March 19, 2018, invoice for the copying costs of 181 pages of records. (*Id*. at 24.) Plaintiff provided payment in full on April 3, 2018. (Dkt. No. 1, at ¶ 70 [Plf.'s Compl.].) Plaintiff received the records on May 8, 2018, approximately one month after payment. (*Id*. at ¶ 71.)

On May 18, 2018, Plaintiff made an additional request for records related to Inmate B. (Dkt. No. 16, Attach. 1, at 25.) On June 11, 2018, DOCCS provided a cost estimate for the

copying of approximately 31 pages of records. (*Id.*) On June 28, 2018, Plaintiff provided payment in full, and received the requested records on July 10, 2018. (Dkt. No. 25, Attach. 2, at ¶¶ 52-53 [Plf.'s Rule 7.1 Statement].)

In light of the parties' regular correspondence, and the prompt delivery of all records requested by Plaintiff (taking into consideration the number of pages related to each request and the time it took for DOCCS to provide the copies of those pages after payment was received), the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate B as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to Inmate B's records for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested records related to Inmate B for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### e. Inmate C Records

Plaintiff submitted a request for records for Inmate C dated March 9, 2018. (Dkt. No. 16, Attach. 1, at 28.) DOCCS provided a copying cost estimate for 157 pages of records in a letter dated March 15, 2018. (*Id.*) Plaintiff provided payment on or about April 2, 2018, and received the requested records from DOCCS on or about April 12, 2018. (Dkt. No. 1, at ¶¶ 77-78 [Plf.'s Compl.].) In light of the number of records and the short response time to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate C as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary

judgment with regard to Inmate C's records for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested records related to Inmate C for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### f.      Inmate D Records

Plaintiff requested records related to Inmate D on or about March 13, 2018.  (Dkt. No. 16, Attach. 1, at 43.)  DOCCS apparently responded in a letter dated March 21, 2018, but Plaintiff did not receive it.  (*Id*. at 45-46.)  Plaintiff did not follow up until July 18, 2018, and DOCCS responded on or about July 24, 2018, with a cost estimate for copying 9 pages of records.  (*Id*. at 48.)  Plaintiff issued payment for the records on or about August 3, 2018.  In correspondence dated August 24, 2018 (but apparently not sent until September 12, 2018), DOCCS provided copies of these records.  (*Id*. at 49.)  In light of the more than one-month delay between Plaintiff's payment and Defendants' delivery of nine pages of records, the Court finds that a genuine dispute of material fact exists regarding whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate D.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate D's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### g.      Inmate E Records

Plaintiff submitted a request for records for Inmate E, dated March 14, 2018.  (*Id*. at 51.) DOCCS provided a copying cost estimate for 99 pages of records, in a letter dated March 26,

2018. (*Id*. at 56.) Plaintiff provided payment on or about April 12, 2018, and received the requested records from DOCCS on or about April 30, 2018. (Dkt. No. 1, at ¶¶ 86-87 [Plf.'s Compl.]; Dkt. No. 25, Attach. 1, at ¶ 5 [Charland Decl.].)

Plaintiff made a second records request related to Inmate E on or about June 11, 2018. (Dkt. No. 16, Attach. 1, at 65.) DOCCS responded in a letter dated June 21, 2018, that provided a copying cost estimate for 252 pages of medical records related to Inmate E. (*Id*. at 67.) On July 9, 2018, Plaintiff responded, and requested confirmation that all 252 pages were responsive to the specific items outlined in its request of June 11, 2018. (*Id*. at 68-69.) In a letter dated July 16, 2018, DOCCS declined to further clarify its response, but stated that the documents were still available to Plaintiff upon payment. (*Id*. at 70.) To date, Plaintiff appears to not have provided payment.

In light of DOCCS' prompt response to the first request for Inmate E's records, this Court finds that DOCCS did not violate its obligation under the P&A statutes with respect to this request of March 14, 2018. Plaintiff's second request for Inmate E's records seeks a level of review and investigation from DOCCS that far surpasses the "access" granted by the P&A statutes; if Plaintiff wished to determine whether all 252 pages identified were truly responsive to its request, it had the ability to do so itself by physically reviewing the records at the facility, particularly given the fact that Plaintiff itself was in the best position to determine what records were responsive to its request. Therefore, in light of the nature of Plaintiff's request, Plaintiff's apparent refusal to physically inspect the records, and Plaintiff's failure to pay copying costs for the 252 pages offered by DOCCS, this Court also finds that, as a matter of law, DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate E by failing to provide these records to date with respect to the request of June 11, 2018.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to Inmate E's records for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested records related to Inmate E for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### h.    Inmate F Records

As detailed in the Complaint, Plaintiff requested records related to Inmate F on April 17, 2018. (Dkt. No. 1, at ¶ 97 [Plf.'s Compl.].) Plaintiff alleges in the Complaint that it received an estimate of copying costs from DOCCS on April 20, 2018, and issued a payment on the same day. (*Id*. ¶ 99.) However, in her declaration, Ms. Sheehan states that DOCCS' estimate was actually sent on April 24, 2018, and that she is not sure when payment was received. (Dkt. No. 15, Attach. 3, at ¶¶ 107-110 [Sheehan Decl.].) Ms. Sheehan also states that the estimate provided indicated 359 pages of records. (*Id.* at ¶ 108.) Plaintiff received the records related to Inmate F on May 14, 2018. (*Id*. ¶ 101).

Even assuming that the estimate and payment were provided on the date alleged in the Complaint given the lack of specific evidence of the date of payment to contradict Plaintiff's allegations, the Court finds that, as a matter of law, Defendants did not violate their obligations under the PAIMI Act with regard to Inmate F based on the large number of records and the reasonably prompt time in which they were provided to Plaintiff.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to Inmate F's records for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested

records related to Inmate F for purposes of Plaintiff's claims under the DD Act and PAIR Act

(because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records

for purposes of the DD Act and PAIR Act).

### i. Records for Inmates G, H, I and J

On April 18, 2018, Plaintiff submitted a combined request for records related to Inmates

G, H, I, and J. (Dkt. No. 16, Attach. 1, at 95-98.) In a letter dated May 1, 2018, and received by

Plaintiff on May 10, 2018, DOCCS informed Plaintiff that the requested records were held at

three separate DOCCS facilities, and were "extensive." (*Id*. at 101.) DOCCS indicated that it

would provide a cost estimate of copying costs, as requested by Plaintiff, under separate cover.

(*Id*.) In a letter dated June 18, 2018, and received by Plaintiff on June 21, 2018, DOCCS

provided an estimated copying cost for the 1,777 pages of responsive records that had been found

to date. (*Id*. at 102-106.) Plaintiff issued payment for the records on or about July 12, 2018, and

received 830 pages of responsive documents on August 29, 2018. (*Id*. at 107-108.) Additional

responsive records were provided in November 2018. (Dkt. No. 25, Attach. 22, at ¶ 5 [Rosenthal

Decl.].) In support of this motion, Defendants indicated that several hundred other pages of

documents were being reviewed by DOCCS, and would be provided in due course. (Dkt. No. 15,

Attach. 3, at ¶ 157 [Sheehan Decl.].)

In light of the regular correspondence between the parties, the volume of the records

requested, and the continuing delivery of records requested by Plaintiff, the Court finds that

DOCCS did not violate its obligations under the PAIMI Act with respect to the requests for

records of Inmates G, H, I, and J, as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary

judgment with regard to the records of Inmates G, H, I, and J for purposes of Plaintiff's claim

under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested records related to Inmates G, H, I, and J for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### j.      Inmate K Records

On April 20, 2018, Plaintiff requested records related to Inmate K.  (Dkt. No. 16, Attach. 1, at 162.)  On May 9, 2018, Plaintiff received a letter from DOCCS with a cost estimate for 31 pages of records.  (*Id*. at 167.)  Plaintiff issued payment for the records on July 12, 2018, and received the records related to Inmate K on July 24, 2018.  (Dkt. No. 1, at ¶ 132-33 [Plf.'s Compl.].)  In light of the number of records and the short response time to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate K, as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate K for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff requested records related to Inmate K for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### k.      Inmate L Records

On April 20, 2018, Plaintiff requested records related to Inmate L.  (Dkt. No. 16, Attach. 1, at 168-69.)  In a letter dated May 22, 2018, but not received by Plaintiff until June 14, 2018,

DOCCS provided a cost estimate for 19 pages of records.[46]  (*Id*. at 172.)  Plaintiff issued payment on June 28, 2018, and received the records on July 17, 2018.  (Dkt. No. 1, at ¶¶ 138-39 [Plf.'s Compl.].)

In light of the more than one-month delay between Plaintiff's request and the initial response with a cost estimate, and the time it took to provide the minimal number of documents at issue, a reasonable fact finder could conclude that Defendants violated their obligations pursuant to the PAIMI Act with regard to Inmate L, as a matter of law.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate L's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### l.    Inmate M Records

On April 20, 2018, Plaintiff requested records related to Inmate M.  (Dkt. No. 16, Attach. 1, at 174.)  On May 21, 2018, Plaintiff received a letter from DOCCS with the cost estimate for copying 38 pages of records responsive to the request.  (*Id*. at 179.)  On June 4, 2018, Plaintiff issued a payment for the records related to Inmate M.  (Dkt. No. 1, at ¶ 143 [Plf.'s Compl.].)  On June 14, 2018, Plaintiff received records related to Inmate M.  (*Id*. at ¶ 144.)  In light of the short response time that existed in which to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate M, as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate M for purposes of Plaintiff's claim under the

---

[46]    In the letter, DOCCS incorrectly referred to Plaintiff's request as one made pursuant to the New York State Freedom of Information Law or "FOIL."

PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff

requested records related to Inmate M for purposes of Plaintiff's claims under the DD Act and

PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected"

the records for purposes of the DD Act and PAIR Act).

### m.    Inmate N Records

On April 20, 2018, Plaintiff requested records related to Inmate N.  (Dkt. No. 16, Attach.

1, at 180.)  On May 2, 2018, Plaintiff received a letter from DOCCS with the cost estimate for

377 pages of records related to Inmate N.  (*Id*. at 185.)   On May 14, 2018, Plaintiff issued a

payment for the records requested related to Inmate N.  (Dkt. No. 1, at ¶ 148 [Plf.'s Compl.].)

On May 24, 2018, Plaintiff received records related to Inmate N.  (*Id*. at ¶ 149.)  In light of the

number of documents requested and the short response time to fulfill Plaintiff's request, the

Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to

Inmate N, as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary

judgment with regard to the records of Inmate N for purposes of Plaintiff's claim under the

PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff

requested records related to Inmate N for purposes of Plaintiff's claims under the DD Act and

PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected"

the records for purposes of the DD Act and PAIR Act).

### n.    Inmate O Records

On April 24, 2018, Plaintiff requested records related to Inmate O.  (Dkt. No. 16, Attach.

1, at 186.)  On May 9, 2018, Plaintiff received a letter from DOCCS with the copying cost

estimate for 138 pages of records related to Inmate O.  (*Id*. at 191.)  On May 21, 2018, Plaintiff

issued a payment for the records related to Inmate O. (Dkt. No. 1, at ¶ 153 [Plf.'s Compl.].) This payment was incorrectly processed by DOCCS, and the requested records were not sent to Plaintiff until October 1, 2018. (Dkt. No. 15, Attach. 3, at ¶¶ 191-92 [Sheehan Decl.].) In light of the more than three-month delay between Plaintiff's payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists regarding whether DOCCS violated its obligations pursuant to the PAIMI Act.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate O's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### o.      Inmate P Records

On April 24, 2018, Plaintiff requested records related to Inmate P pursuant to its P&A authority by email. (Dkt. No. 16, Attach. 1, at 194.) On May 7, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 17 pages of records related to Inmate P. (*Id*. at 199.) On May 21, 2018, Plaintiff issued a payment for the records related to Inmate P. (Dkt. No. 1, at ¶ 153 [Plf.'s Compl.].) This payment was incorrectly processed by DOCCS, and the requested records were not sent to Plaintiff until October 4, 2018. (Dkt. No. 15, Attach. 3, at ¶¶ 199-200 [Sheehan Decl.].) In light of the more than three-month delay between Plaintiff's payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations pursuant to the PAIMI Act.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate P's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act,

and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### p.     Inmate Q Records

On April 24, 2018, Plaintiff requested records related to Inmate Q. (Dkt. No. 16, Attach. 1, at 202.) On May 21, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 32 pages of records related to Inmate Q. (*Id*. at 207.) On June 4, 2018, Plaintiff issued a payment for the records requested for Inmate Q. (Dkt. No. 1, at ¶ 163 [Plf.'s Compl.]). This payment was incorrectly processed by DOCCS, and the requested records were not sent to Plaintiff until September 14, 2018. (Dkt. No. 15, Attach. 3, at ¶¶ 206-207 [Sheehan Decl.].) In light of the more than three-month delay between Plaintiff's payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists regarding whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate Q.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate Q's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### q.     Inmate R Records

On May 2, 2018, Plaintiff requested records related to Inmate R. (Dkt. No. 16, Attach. 1, at 211.) By letter dated May 24, 2018, DOCCS provided Plaintiff a cost estimate for the 354 pages of records related to Inmate R. (*Id*. at 215.) On June 11, 2018, Plaintiff issued a payment to DOCCS for the records of Inmate R. (Dkt. No. 1, at ¶ 169 [Plf.'s Compl.].) Plaintiff received records related to Inmate R on June 22, 2018, and June 25, 2018. (Dkt. No. 16, Attach. 1, at 220 [Sheehan Decl.].) In light of the number of documents requested and the short response time to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the

PAIMI Act with regard to Inmate R, as a matter of law.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate R for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to the requested records related to Inmate R for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### r.    Inmate S Records

On May 22, 2018, Plaintiff requested records related to Inmate S, pursuant to its P&A authority.  (*Id*. at 221-23.)  On June 20, 2018, Plaintiff received a letter from DOCCS with the copying cost estimate for requested records related to Inmate S.  (*Id*. at 227.)   On July 12, 2018, Plaintiff issued a payment for the records requested related to Inmate S.  (*Id*. at 229.)  This payment was incorrectly processed by DOCCS, and the requested records were not sent to Plaintiff until October 2, 2018.  (Dkt. No. 15, Attach. 3, at ¶¶ 222-23 [Sheehan Decl.].)  In light of the nearly three-month delay between Plaintiff's payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists regarding whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate S.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate S's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### s.    Inmate T Records

On May 23, 2018, Plaintiff requested records related to Inmate T.  (Dkt. No. 16, Attach.

1, at 236.) On June 18, 2018, Plaintiff received a letter from DOCCS with the copying cost estimate for 21 pages of records related to Inmate T. (*Id*. at 239.) On June 28, 2018, Plaintiff issued a payment for the records related to Inmate T. (*Id*. at 240.) On August 2, 2018, Plaintiff received records related to Inmate T. (*Id*.) In light of the fact that it took Defendants more than a month to provide a small number of records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate T.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate T's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### t.    Inmate U Records

On June 11, 2018, Plaintiff requested records related to Inmate U. (*Id*. at 248.) On July 6, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 331 pages of records related to Inmate U. (*Id*. at 251.) On July 12, 2018, Plaintiff issued a payment for the records related to Inmate U. (*Id*. at 255.) On July 23, 2018, Plaintiff received records related to Inmate U. (*Id*. at 252.) In light of the number of documents requested and the short amount of time that existed in which to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate U.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate U for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to the requested records related to Inmate U for purposes of Plaintiff's claims under the DD Act and PAIR Act

(because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### u. Inmate V Records

On June 11, 2018, Plaintiff requested records related to Inmate V. (*Id*. at 263.) On July 18, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 354 pages of records related to Inmate V. (*Id*. at 265.) In August and September, Plaintiff and DOCCS exchanged correspondence regarding Inmate V's location, following a temporary transfer. (Dkt. No. 15, Attach. 3, at ¶¶ 251-54 [Sheehan Decl.].) On September 21, 2018, Plaintiff issued a payment for the records related to Inmate V. (Dkt. No. 25, Attach. 19, at 16.) On October 12, 2018, Plaintiff received records related to Inmate V. (Dkt. No. 25, Attach. 9, at ¶ 22 [Charland Decl.].) In light of the number of documents requested, the regular communication between the parties, and the response time to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate V.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate V for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff's requested records related to Inmate V for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### v. Inmate W Records

On June 14, 2018, Plaintiff requested records related to Inmate W. (Dkt. No. 16, Attach. 1, at 270.) On July 9, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 11 pages of records related to Inmate W. (*Id*. at 275.) On July 12, 2018, Plaintiff issued a payment

for the records requested related to Inmate W. (Dkt. No. 1, at ¶ 197 [Plf.'s Compl.] On July 26, 2018, Plaintiff received records related to Inmate W. (*Id*. at ¶ 198.) Although Defendants provided the requested records within 14 days, given the small number of records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate W.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate W's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### w.      Inmate X Records

On June 14, 2018, Plaintiff requested records related to Inmate X. (Dkt. No. 16, Attach. 1, at 276 [Sheehan Decl.].) On July 5, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 83 pages of records related to Inmate X. (*Id*. at 280.) On July 12, 2018, Plaintiff issued a payment for the records related to Inmate X. (Dkt. No. 1, at ¶ 202 [Plf.'s Compl.].) This payment was incorrectly processed by DOCCS, and the requested records were not sent to Plaintiff until September 28, 2018. (Dkt. No. 15, Attach. 3, at ¶¶ 266-67 [Sheehan Decl.].) In light of the more than two-month delay between Plaintiff's payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate X.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate X's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### x.        Inmate Y Records

On June 18, 2018, Plaintiff requested records related to Inmate Y pursuant to its

P&A authority.  (Dkt. No. 16, Attach. 1, at 283.)  On August 3, 2018, Plaintiff received a letter

from DOCCS with the cost estimate for 7 pages of records related to Inmate Y.  (*Id*. at 288.)

Plaintiff contends that it provided payment on or about August 13, 2018.  (Dkt. No. 1, at ¶ 207

[Plf.'s Compl.].)  DOCCS contends that it has no record of such payment, but that all responsive

records will be sent upon receipt of payment.  (Dkt. No. 15, Attach. 3, at ¶ 274 [Sheehan Decl.]).

In light of the dispute regarding payment, there is a material question of fact regarding whether

DOCCS has violated the PAIMI Act with regard to Inmate Y.

For all of these reasons, the Court finds that neither party is entitled to summary judgment

with regard to Inmate Y's records because a genuine dispute of material fact exists as to whether

Defendants denied Plaintiff access to these records.

### y.        Inmate Z Records

On June 18, 2018, Plaintiff requested records related to Inmate Z.  (Dkt. No. 16, Attach.

1, at 289 [Sheehan Decl.].)  On September 12, 2018, Plaintiff received a letter from DOCCS with

the cost estimate for 156 pages of  records related to Inmate Z.  (*Id*. at 294.)  On September 21,

Plaintiff issued a payment for the records requested related to Inmate Z.  (*Id*. at 296.)  On October

1, 2018, Plaintiff received records related to Inmate Z.  (*Id*. at 295.)  In light of the nearly three-

month delay between Plaintiff's request and DOCCS initial response, the Court finds that a

genuine dispute of material fact exists as to whether DOCCS violated its obligations under the

PAIMI Act with regard to Inmate Z.

For all of these reasons, the Court finds that neither party is entitled to summary judgment

with regard to Inmate Z's records because a genuine dispute of material fact exists as to whether

(a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### z.      Inmate AA Records

On June 20, 2018, Plaintiff requested records related to Inmate AA.  (*Id*. at 297.)  Due to a processing error, DOCCS did not respond to Plaintiff's request until September 7, 2018.  (Dkt. No. 15, Attach. 3, at ¶ 283 [Sheehan Decl.].)  To correct its error, DOCCS provided 62 pages of records related to Inmate AA, and waived the copying fees.  (*Id*.)  Despite DOCCS' attempt to make amends for its error, because of the nearly three-month delay between Plaintiff's request and DOCCS initial response, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate AA.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate AA's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### aa.      Inmate BB Records

On June 20, 2018, Plaintiff requested records related to Inmate BB.  (Dkt. No. 16, Attach. 1, at 303.)  On July 12, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 4 pages of records related to Inmate BB.  (*Id*. at 308.)  On July 18, 2018, Plaintiff issued a payment for the records related to Inmate BB.  (*Id*. at 309-10.)  Defendants have filed a letter dated July 20, 2018, indicating that the records responsive to Plaintiff's request were enclosed.  (*Id*. at 310.)  Plaintiff argues that it has not received the documents.  (Dkt. No. 1, at ¶ 221 [Plf.'s Compl.].)  In light of the dispute regarding receipt of the records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with

regard to Inmate BB.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate BB's records because a genuine dispute of material fact exists as to whether Defendants denied Plaintiff access to these records.

### bb.    Inmate CC Records

On June 20, 2018, Plaintiff requested records related to Inmate CC. [Dkt. No. 16, Attach. 1, at 311.)  On July 20, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 15 pages of records related to Inmate CC.  (*Id.* at 316.)   Plaintiff has provided proof that it issued a check for payment in full on July 24, 2018.  (Dkt. No. 25, Attach. 19, at 20.)  Defendants contend that DOCCS has no record of receiving this payment.  (Dkt. No. 15, Attach. 3, at ¶ 296 [Sheehan Decl.].)  However, on October 3, 2018, Plaintiff received the records related to Inmate CC.  (Dkt. No. 25, Attach. 11, at 70 [Galea Decl.].)  In light of the more than two-month delay between Plaintiff's disputed payment and the production of the requested records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate CC.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate CC's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### cc.    Inmate DD Records

On June 22, 2018, Plaintiff requested records related to Inmate DD.  (Dkt. No. 16, Attach. 1, at 317.)  DOCCS has provided a letter dated July 16, 2018, with a cost estimate for seven pages of records responsive to Plaintiff's request.  (*Id.* at 323.)  DOCCS re-sent this letter to

Plaintiff on September 7, 2018, because it could not confirm that it had been received in July of 2018. (*Id*. at 322.) Plaintiff provided payment on September 21, 2018. (*Id*. at 324.) On October 11, 2018, DOCCS sent the requested records to Plaintiff, and refunded Plaintiff's payment. (*Id*. at 325.) In light of the apparent three-month delay between Plaintiff's request and DOCCS initial response, and the 20 days to provide this small number of records after payment, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate DD.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate DD's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### dd.    Inmate EE Records

On June 22, 2018, Plaintiff requested records related to Inmate EE. (Dkt. No. 16, Attach. 1, at 326.) On July 20, 2018, Plaintiff received DOCCS's letter with the cost estimate for 31 pages of records related to Inmate EE. (*Id*. at 328.) On July 27, 2018, DOCCS received Plaintiff's payment. (*Id*. at 329.) Inmate EE was transferred, along with his records, to another facility on August 9, 2018. (Dkt. No. 15, Attach. 3, at ¶ 311 [Sheehan Decl.].) On September 28, 2018, DOCCS notified the new facility of the records request and payment. (*Id*. at ¶ 312.) On October 3, 2018, DOCCS sent Plaintiff the requested records for Inmate EE. (*Id*. at ¶ 313.) In light of the more than two-month delay between Plaintiff's payment and the production of the requested records (including the nearly two months it took Defendants to notify the new facility of the records request), the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate EE.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate EE's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### ee.    Inmate FF Records

On June 22, 2018, Plaintiff requested records related to Inmate FF.  (Dkt. No. 16, Attach. 1, at 331.)  On July 24, 2018, Plaintiff received a cost estimate from DOCCS for 57 pages of records related to Inmate FF.  (*Id*. at 336.)  On August 10, 2018, DOCCS deposited payment from Plaintiff.  (*Id*. at 337.)  On September 13, 2018, DOCCS sent Plaintiff the requested records.  (*Id*. at 338.)  In light of the more than a month it took Defendants to fulfill Plaintiff's request for a relatively small number of records, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate FF.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate FF's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### ff.    Inmate GG Records

On June 25, 2018, Plaintiff requested records related to Inmate GG.  (*Id*. at 340.)  On July 25, 2018, Plaintiff received a letter from DOCCS with the cost estimate for 610 pages of records related to Inmate GG.  (*Id*. at 346.)  On August 3, 2018, Plaintiff issued a payment for the records requested related to Inmate GG.  (*Id*. at 347.)  On August 29, 2018, Plaintiff received records related to Inmate GG.  (*Id*. at 348.)  In light of the number of documents requested and the short

response time to fulfill Plaintiff's request, the Court finds that DOCCS did not violate its obligations under the PAIMI Act with regard to Inmate GG.

For all of these reasons, the Court finds that (1) Defendants are entitled to summary judgment with regard to the records of Inmate GG for purposes of Plaintiff's claim under the PAIMI Act, and (2) neither party is entitled to summary judgment with regard to Plaintiff's requested records related to Inmate GG for purposes of Plaintiff's claims under the DD Act and PAIR Act (because a genuine dispute of material fact exists as to whether Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act).

### gg. Inmate HH Records

On July 6, 2018, Plaintiff requested records related to Inmate HH. (*Id*. at 351.) DOCCS provided a cost estimate for 156 pages of records related to Inmate HH, in a letter dated September 7, 2018. (*Id*. at 356.) Plaintiff received this cost estimate on September 12, 2018. On September 21, 2018, Plaintiff issued a payment for the records related to Inmate HH. (*Id*. at 357.) On October 5, 2018, Plaintiff received records related to Inmate HH. (*Id*. at 358.) In light of the apparent two-month delay between Plaintiff's request and DOCCS initial response, the Court finds that a genuine dispute of material fact exists as to whether DOCCS violated its obligations under the PAIMI Act with regard to Inmate HH.

For all of these reasons, the Court finds that neither party is entitled to summary judgment with regard to Inmate HH's records because a genuine dispute of material fact exists as to whether (a) Defendants' provision of access was "prompt" (and/or in good faith) under the PAIMI Act, and (b) Plaintiff "inspected" the records for purposes of the DD Act and PAIR Act.

### C. Plaintiff's Cross-Motion for Summary Judgment

After carefully considering the matter, the Court denies Plaintiff's cross-motion in its

entirety for the reasons set forth above. *See, supra,* Parts I.C.3., I.C.5. and III.A. of this Decision and Order. To the reasons already provided, the Court would add only that nothing in Plaintiff's cross-motion somehow transforms the disputed material facts found by the Court into undisputed material facts that warrant summary judgment in Plaintiff's favor.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion for permission to refer to the inmates referenced in the Complaint by pseudonyms (Dkt. No. 5) is **GRANTED**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 15) is **GRANTED in part and DENIED in part** in accordance with Part III.B. of this Decision and Order; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 25) is **DENIED** in accordance with Part III.C. of this Decision and Order; and it is further

**ORDERED** that the following are **DISMISSED**:

(1) Plaintiff's request for prospective injunctive relief;

(2) Plaintiff's request for a declaratory judgment that Defendants are obligated to ensure that the access rights granted to Plaintiff by the P&A Acts are fully and uniformly implemented; and

(3) Plaintiff's claims under the PAIMI Act as to Inmates B, C, E, F, G, H, I, J, K, M, N, R, U, V and GG; and it is further

**ORDERED** that the following **SURVIVE** the parties' cross-motions for summary judgment:

(1) Plaintiff's request for a declaratory judgment that Defendants have violated

93

Plaintiff's rights under the P&A Acts;

(2) Plaintiff's claims under the PAIMI Act as to Inmates A, D, L, O, P, Q, S, T, W, X, Y, Z, AA, BB, CC, DD, EE, FF and HH, and the records related to DOCCS' facilitation of RTF services; and

(3) Plaintiff's claims under the DD Act and PAIR Act as to Inmates A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, and HH, and the records related to DOCCS' facilitation of RTF services; and it is further

**ORDERED** that counsel are directed to appear on **November 7, 2019 at 11:00 AM** in Syracuse, NY for a pretrial conference, at which time counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to Defendants no later than October 11, 2019, and the parties are directed to engage in meaningful settlement negotiations before the conference. In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week before the scheduled conference.

Dated: September 24, 2019
          Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge